SHARON L. DOWELL *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. STEVEN BITNER, Defendant-Appellee and Cross-Appellant.

Fourth District   No. 4—94—1029

Argued June 20, 1995.—Opinion filed July 12, 1995.—Rehearing denied August 17, 1995.

Stephen D. Gay (argued) and Jeffrey Alan Ryva, both of Husch & Eppenberger, of Peoria, for appellants.

Alan D. Tucker, of Law Offices of Alan D. Tucker, P.C., of Havana, and Steven P. Oates (argued), of Sutkowski & Washkuhn, of Peoria, for appellee.

JUSTICE LUND delivered the opinion of the court:

Plaintiffs Sharon Dowell and P&A Irrigation, Inc. (P&A), filed this action against defendant Steven Bitner for breaches of fiduciary duty owed to Dowell and P&A. Bitner withdrew from P&A and a partnership with Dowell and established a competing company. The trial court granted, in part, a motion for summary judgment. At the close of the plaintiffs' case during the bench trial, the court granted

Bitner's motion for a directed judgment. Dowell and P&A now appeal, and Bitner cross-appeals. We reverse and remand.

We relate those facts relevant to this appeal. Dowell and P&A filed a complaint on April 13, 1989. The complaint alleged the following. In October 1983, Dowell and Bitner commenced business as S&S Irrigation Company (S&S), pursuant to an oral partnership agreement, as a supplier of irrigation equipment. Bitner presented Dowell with a partnership agreement on March 13, 1989, which Dowell signed on March 15, 1989. The partnership agreement allowed either partner to terminate the partnership by giving 30 days of written notice to the other partner. Bitner delivered a signed termination notice to Dowell which was dated March 17, 1989, and made effective April 15, 1989. The termination notice provided only 29 days of notice. The complaint further alleged that on March 19, 1984, Dowell, Bitner, and four others executed a preincorporation agreement to form P&A. P&A was formed to engage in the business of sales and service of irrigation systems, including parts, in a certain portion of central Illinois. Bitner was an officer, director, and employee of P&A until his resignations. Bitner first resigned as an employee of P&A as of March 17, 1989, and later resigned as an officer and director.

The complaint also alleged that Bitner owed Dowell, his partner, a fiduciary duty. In addition, as an officer, director, and employee of P&A, Bitner owed a fiduciary duty to P&A. The complaint alleged various ways in which Bitner breached his fiduciary duties, including: commencing his own business, signing an agreement with an irrigation supplier which competes with P&A and the partnership, and soliciting an employee of the business to go with him into his new business. The complaint asked for the equitable relief of voiding the partnership agreement and termination notice, dissolving the partnership, giving Dowell an accounting, and allowing Dowell to wind up the partnership's affairs. The complaint also asked for compensatory and punitive damages as a result of the breaches of fiduciary duties.

Bitner filed a counterclaim requesting the court to enforce the termination notice or, in the alternative, to dissolve S&S, take an accounting, dispose of S&S property, and divide the proceeds.

Bitner filed a motion for summary judgment or summary determination of major issues. Bitner attached several supporting documents to his memorandum in support his motion. One of those documents was Bitner's affidavit, which related the following. On March 18, 1989, Bitner informed Dowell and the three other principals in P&A that he was quitting P&A. On March 20, 1989, Bitner established Central Illinois Irrigation (Central) for the purpose of market-

ing and servicing irrigation equipment. Central performed its first job later that week. Bitner was not bound by any contractual non-competition obligation to either S&S or P&A. Prior to March 18, 1989, Bitner's activities with respect to Central were limited to planning and formation. No commitments or agreements were made by Central until after March 20, 1989. Bitner performed no work for S&S after March 17, 1989. After March 18, 1989, Bitner did not control, attempt to control, or interfere with the operation of P&A; and he did not take any role as an officer or director in the government of P&A. Bitner owned 23% of the shares of P&A until July 1991.

In addition, Bitner attached excerpts from Dowell's deposition to his motion. In the deposition, Dowell stated there was a meeting in Dowell's office lasting five to seven minutes. Dowell, Leo Pfeiffer, Dean Pfeiffer, and Darrell Pfeiffer (all shareholders, officers, and directors of P&A) were present. Bitner walked in and stated he was quitting and going to work for the competition. They changed the locks the next day.

A hearing on the motion for summary judgment was held on October 17, 1994. After hearing argument from counsel, the court stated:

> "No doubt the partnership terminated on March 17, 1989[,] at which time Mr. Bitner gave notice of termination ineffective to create or support the existence of the option[;] however[,] it was an act in furtherance[,] in my mind[,] the partnership was effectively terminated on that day. Further[,] by Mr. Dowell[,] he changed the locks and locked it up, his words, not mine, locked up the partnership office the very next day. To me, even if the notice was ineffective, the actions of Mr. Dowell[,] he assumed they were effective and treated as severance and therefore I find it did terminate on that date."

In addition, the court stated Bitner's duty to P&A as a shareholder terminated on March 18, 1989, but his duty as a director and officer ended when he reduced his resignation to writing on March 24, 1989.

The bench trial occurred on October 18 and 19, 1994. The plaintiffs called Bitner as an adverse witness, and he related the following. He is self-employed, and the name of his company is Central Illinois Irrigation. He was formerly employed by P&A. He first became affiliated with P&A in 1983 or 1984 when it was incorporated by Bitner and five other people: Sharon Dowell, Dean Pfeiffer, Leo Pfeiffer, Darrell Pfeiffer, and Dan Johnston. (Johnston sold his shares in 1988.) Bitner was a director and held the office of secretary. He sold his shares of P&A in July 1991. P&A sold and serviced Reinke pivots and pumps.

As an employee of P&A, Bitner was in charge of sales and service. Customers of P&A were more likely to know Bitner than other employees of P&A. As part of his job, Bitner regularly attended annual Reinke meetings for the purpose of learning more about Reinke systems and how to sell and service them. He also attended other irrigation-related meetings, such as Illinois Irrigation Growers (Illinois Irrigation) meetings. In the course of attending these meetings, Bitner became acquainted with various people, including other Reinke dealers. Bitner went to an Illinois Irrigation meeting in January 1989. At that meeting, he spent time talking to Clause McCullough, who is associated with T-L Irrigation Company (T-L). T-L is a brand of center pivots competing with Reinke. Bitner received a franchise for T-L center pivots when he went into business on his own.

In the first or second week of March 1989, Bitner asked McCullough if he could have a center pivot franchise for a T-L dealership. McCullough said he was looking for a dealer, and he would consider the matter after receiving Bitner's financial statements.

Bitner left employment with P&A on March 18, 1989, by telling Dowell and the Pfeiffers that he was quitting. On March 24, 1989, Bitner gave P&A's attorney a written resignation as secretary and director.

On March 20, 1989, Bitner sent a letter to potential customers. The letter stated that Bitner had a T-L franchise and would appreciate their business. Bitner sent the letter to most of the P&A and S&S customers. However, Bitner did not actually have a T-L franchise. He had a verbal agreement to receive the dealership if everything went properly. Bitner assumed from his conversation with McCullough and from what he knew about his financial statement that he would receive the franchise. In addition, Bitner's letter indicated that he had parts and service available for Reinke. Since Bitner was not a Reinke dealer, he had to purchase parts from a dealer. Dave Norton, a Reinke dealer from Missouri, was one of Bitner's two principal parts suppliers.

Bitner spent the rest of the week of March 20, 1989, attempting to get his business in order. He primarily contacted customers and told them he was no longer employed by P&A and that he had his own business and would appreciate their business. In addition, Darren Wilcoxsen assisted in setting up the service portion of Central. Wilcoxsen was a former serviceman with P&A. Bitner considered Wilcoxsen to be P&A's best serviceman. Bitner contacted Wilcoxsen prior to March 17, 1989, and asked Wilcoxsen to work for him. Central began performing service work the week of March 20, 1989.

The first customer was probably a P&A customer. Thereafter, Bitner regularly serviced P&A and S&S customers. He continued to solicit P&A customers, in addition to other farmers. Many of his customers in 1989 were P&A customers.

The trial court refused to admit evidence of breach or damages occurring after March 24, 1989.

On examination by his own counsel, Bitner related the following. He did not sign noncompetition agreements with S&S, P&A, or Dowell. Bitner has known McCullough since 1975 or 1976 and had discussions with him in the early part of March 1989. McCullough gave his final approval and signature for Bitner to receive a T-L dealership on March 29, 1989, and Bitner did not have a commitment from McCullough for a T-L dealership prior to that date. T-L requires new dealers to have spare parts, tools, and books on hand when they become a dealer. Bitner ordered these items on March 29, 1989.

Similarly, Bitner has known Dave Norton for several years. Bitner did not have an agreement with Norton to sell Reinke parts prior to March 29, 1989. He first purchased parts from Norton after March 20, 1989. P&A had the only Reinke dealership in the area in March 1989. Not everyone who owned Reinke equipment was a customer of P&A. Bitner also serviced brands other than Reinke.

Bitner has known Wilcoxsen for a long time; he is Bitner's brother-in-law. Prior to March 20, 1989, Bitner spoke to Wilcoxsen about employing him.

Central had no net operating income for the period of March 20 through March 24, 1989. Prior to March 24, 1989, Central did not have a telephone number, building, or office—Bitner did everything from his home. Central first obtained a building in April 1989.

Darrell Pfeiffer testified as follows. He is a stockholder, director, and vice-president of P&A. At the March 18, 1989, meeting, Bitner did not submit his resignation; he merely stated that he was leaving the business. Within a week following the meeting, the directors of P&A met and elected different officers.

Sharon "Speed" Dowell testified as follows. He has worked for P&A Irrigation since it was formed in 1984. Prior to incorporation, P&A was owned and operated by the Pfeiffers. Dowell, Bitner, and Johnston were brought into the company because the Pfeiffers (who were farmers) had acquired more land and did not have time to run the business.

In the second week of February 1989, Bitner, Dowell, and others went to the Reinke annual sales meeting. During the previous meetings, those attending from P&A generally stayed together and socialized together. The only time Dowell saw Bitner was at the meetings. Any other time Dowell saw Bitner, Bitner was with Norton.

At the close of the plaintiffs' case, Bitner made a motion for a directed judgment regarding the breaches of fiduciary duties. Bitner's trial counsel also stated, "Then[,] finally, the only issue that remains is the accounting, the partnership accounting[,] and we would like to take that up this afternoon." When the court ruled on the motion, the court stated:

"I find that [Bitner] did not breach his fiduciary duty. I further find no damaged [*sic*] flowed from the nonexistent breach. I do find, however, that the partnership winding up was fair, reasonable and proper."

On appeal, the plaintiffs assert the trial court erred in its legal determinations made in partial summary judgment that Bitner's fiduciary duties to Dowell and P&A ended in March 1989. As a preliminary matter, Bitner argues the plaintiffs waived their right to appeal the trial court's partial summary judgment by not perfecting an appeal from that ruling. Bitner points out that the plaintiffs appealed from the judgment entered after the bench trial, but they did not specifically mention the partial summary judgment order in their notice of appeal. Illinois Supreme Court Rule 303(b)(2) (Official Reports Advance Sheet No. 26 (December 22, 1993), R. 303(b)(2), eff. February 1, 1994) requires the notice of appeal to "specify the judgment or part thereof or other orders appealed from." The plaintiffs' notice of appeal states the plaintiffs are appealing from judgment entered November 2, 1994, which was entered pursuant to the trial court granting of Bitner's motion for a directed judgment at the close of the plaintiffs' case. Thus, Bitner asserts the plaintiffs waived appeal of the partial summary judgment order by failing to mention it in the notice of appeal.

●1 When an appeal is taken from a specified judgment, the appellate court does not acquire jurisdiction to review other judgments not specified in the notice of appeal. (*United States Fidelity & Guaranty Co. v. Lee* (1992), 230 Ill. App. 3d 635, 637, 594 N.E.2d 1329, 1330.) However, an appeal from a final judgment draws into issue all prior nonfinal orders which produced the final judgment (*In re Marriage of Click* (1988), 169 Ill. App. 3d 48, 54, 523 N.E.2d 169, 173) and all final orders not appealable because of the order's failure to recite that there is no just reason to delay enforcement or appeal pursuant to Supreme Court Rule 304 (Official Reports Advance Sheet No. 26 (December 22, 1993), R. 304, eff. February 1, 1994). (*Lakeview Trust & Savings Bank v. Estrada* (1985), 134 Ill. App. 3d 792, 804-05, 480 N.E.2d 1312, 1321-22.) Stated another way, a notice of appeal may be construed to bring up for review an earlier unspecified order where that order was a step in the procedural progression to the specified

order. (*Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 435, 394 N.E.2d 380, 383.) This court liberally construes a notice of appeal in the absence of prejudice to the litigants. *Smith v. First National Bank* (1993), 254 Ill. App. 3d 251, 260, 624 N.E.2d 899, 906.

The *Smith* case decided by this court is particularly relevant. In *Smith*, the plaintiff, beneficiary of a trust, sued the defendant bank (trustee of the trust) for a breach of fiduciary duty. On advice from the bank, the plaintiff had made a bad investment by purchasing a tavern from the bank. The bank counterclaimed for notes securing debt incurred by the plaintiff in purchasing and operating the tavern. Before trial, the trial court determined as a matter of law that the bank's fiduciary duty extended to the plaintiff's purchase of the tavern. The plaintiff's action was tried by a jury, and the bank's counterclaims were adjudicated by the trial judge. Both the jury and the judge found for the plaintiff. The bank appealed the judgment on the counterclaims. On appeal, the plaintiff argued the bank could not also contest the trial court's determination regarding the scope of the bank's fiduciary duty, since the appeal was from the entry of judgment on the counterclaim. This court disagreed, stating:

"[T]he order [finding a fiduciary relationship] was a step in the progression to the order entering judgment in favor of [the plaintiff] on the counterclaim. Here, the Bank's notice of appeal requested reversal of the judgment order. Given the interrelationship of the orders, we find the notice of appeal has conferred jurisdiction upon this court to review the propriety of the [order finding a fiduciary relationship]." *Smith*, 254 Ill. App. 3d at 260-61, 624 N.E.2d at 906-07.

Similarly, in the present case, the notice of appeal from the judgment after trial included the partial summary judgment order. The partial summary judgment order merely eliminated a major issue by determining when Bitner's fiduciary duties ended. Pursuant to the order, the trial court limited the plaintiffs' evidence to evidence of breach or damages occurring prior to the relevant dates. This is a step in the procedural progression toward the judgment. As in *Smith*, the summary judgment order and the final judgment are sufficiently interrelated to allow this court to review the propriety of both.

On the merits, we note summary judgments are reviewed *de novo*. (*Golla v. General Motors Corp.* (1994), 261 Ill. App. 3d 143, 147, 633 N.E.2d 193, 196.) P&A argues Bitner owed P&A, which had only six shareholders, a fiduciary duty until Bitner was no longer a shareholder. Bitner owned 23% of the shares, which he sold in July 1991. P&A relies heavily upon *Hagshenas v. Gaylord* (1990), 199 Ill. App.

3d 60, 557 N.E.2d 316, but that reliance is misplaced. In that case, the issue was whether a 50% shareholder owed a fiduciary duty to the other 50% shareholder after resigning as a director and officer of the corporation. The court noted that, in general, a mere owner of stock does not owe a fiduciary duty to the corporation. The court decided the corporation was a close corporation even though it was not incorporated under the Close Corporation Act (Ill. Rev. Stat. 1981, ch. 32, pars. 1201 through 1216), because it fit the common law definition of a close corporation: a corporation which has stock held by few people and the stock is not, or only rarely, dealt with by buying or selling. The court determined the corporation was an enterprise closely resembling a partnership and held that the two shareholders owed a fiduciary duty to each other, similar to partners. The court was not persuaded that the defendant's resignation as director and officer relieved him of his fiduciary duty. The court noted the defendant retained 50% ownership and significant control over the corporation. The court further noted the parties, being equal shareholders, were at each other's mercy. *Hagshenas*, 199 Ill. App. 3d at 68-72, 557 N.E.2d at 321-24.

One other Illinois case, *Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 444 N.E.2d 549, deals with the fiduciary duty of a shareholder in a closely held corporation. In that case, the court determined a majority shareholder in a close corporation had a fiduciary duty to the minority shareholders after resigning his corporate positions. He used his majority status to elect his sister and brother-in-law to corporate positions and thereby retain control. He also fired the plaintiffs from their positions. *Graham*, 111 Ill. App. 3d at 764-65, 444 N.E.2d at 558.

■ P&A argues that Bitner's status as a shareholder imposes upon him a fiduciary duty to P&A. We disagree; something more than mere status as a shareholder in a close corporation is required to impose a fiduciary duty upon Bitner. In light of *Hagshenas* and *Graham*, it could be argued that Illinois courts look at a shareholder's ability to hinder, influence, or control the corporation when determining whether a shareholder has a fiduciary duty to other shareholders. We need not decide whether to adopt this position, because Bitner clearly did not have the ability to hinder, influence, or control P&A. He had no dealings with P&A after his resignation. His status was that of a mere shareholder. Accordingly, we hold that Bitner had no fiduciary duty to P&A as a shareholder after he left employment and was removed from the board of directors.

■ Dowell next claims the trial court erred as a matter of law by determining Bitner's fiduciary duty to Dowell ended on March 17,

1989. The parties do not dispute that dissolution of the partnership ended Bitner's fiduciary duty to Dowell (*Hamilton v. Williams* (1991), 214 Ill. App. 3d 230, 247, 573 N.E.2d 1276, 1288), but they disagree about the date the partnership was dissolved. The Uniform Partnership Act (Act) (805 ILCS 205/1 *et seq.* (West 1994)) defines dissolution as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business" (805 ILCS 205/29 (West 1994)) and specifically relates when a dissolution is caused (see 805 ILCS 205/31, 32 (West 1994)). We note that a court-ordered dissolution only formalizes the demise of a partnership; the partnership dissolves on the occurrence of the conduct giving rise to the court-ordered dissolution. See *Susman v. Cypress Venture* (1989), 187 Ill. App. 3d 312, 318-19, 543 N.E.2d 184, 188-89.

■ The trial court determined Bitner's termination notice, signed and delivered on March 17, 1989, sufficient to dissolve the partnership on that date. We agree. Although the notice stated the partnership would "terminate" on April 15, 1989, Bitner expressed his clear intent to cease his association with the business of the partnership by giving the notice to Dowell. The trial court properly determined the partnership was dissolved on March 17, 1989. See 805 ILCS 205/32(1)(a), (1)(d), (1)(f) (West 1994).

■ P&A also argues an error occurred at trial: namely, the trial court should have allowed it to present evidence of breach by proving events consummating after Bitner resigned as officer and director but beginning before his resignation. Generally, *employees* may plan, form, and outfit a competing corporation while still working for the employer, but they may not commence competition. In the absence of fraud, a contractual restrictive covenant, or the improper taking of a customer list, former employees may compete with their former employers and solicit former customers provided there was no demonstrable business activity before termination of employment. However, *corporate officers* owe a fiduciary duty of loyalty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed. The resignation of an officer will not sever liability for transactions completed after termination of the officer's association with the corporation for transactions which (1) began during the existence of the relationship, or (2) were founded on information acquired during the relationship. (*Veco Corp. v. Babcock* (1993), 243 Ill. App. 3d 153, 160-61, 611 N.E.2d 1054, 1059.) Other cases have reached the same or similar conclusions. (See *Dangeles v. Muhlenfeld* (1989), 191

Ill. App. 3d 791, 796, 548 N.E.2d 45, 49; *Comedy Cottage, Inc. v. Berk* (1986), 145 Ill. App. 3d 355, 360, 495 N.E.2d 1006, 1011; *Smith-Shrader Co. v. Smith* (1985), 136 Ill. App. 3d 571, 578, 483 N.E.2d 283, 289; *H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill. App. 3d 285, 292, 379 N.E.2d 765, 770.) Thus, the trial court erred by not considering or allowing P&A to present evidence of breach through events consummating after Bitner resigned as officer and director but beginning before his resignation. That error requires a reversal and a new trial.

There are at least three possible "consummated events" in this case: (1) Bitner solicited Wilcoxsen, (2) Bitner solicited P&A's customers, and (3) Bitner contacted P&A's suppliers and competing suppliers. The key date is March 24, 1989, which is the date Bitner's fiduciary duty to P&A as officer and director ended. Bitner testified that he spoke to Wilcoxsen prior to March 24, 1989, about employing him. Bitner also testified that he sent a letter to potential customers on March 20, 1989, many of whom were P&A customers. Furthermore, there was testimony that Bitner spoke to Reinke and T-L suppliers prior to March 24, 1989. The trial court refused to admit evidence which indicated that Wilcoxsen actually worked for Bitner, that the solicited P&A customers actually became Bitner's customers, and that Bitner utilized the same or competing suppliers: sales and service records subsequent to March 24, 1989; testimony about sales and service work after March 17, 1989, involving Reinke center pivot systems; sales contracts for T-L systems, used pivots, Lockwood brand systems and parts, pumps, and underground equipment.

Last, Bitner requests that we remand this case to the trial court to determine whether the partnership accounting was fair and reasonable if this court grants any relief to the plaintiffs. When Bitner moved for a directed judgment regarding the breach of fiduciary duties, the trial court also approved the partnership accounting. Bitner claims he had evidence, which he was unable to present, that the winding up was not properly conducted.

Dowell argues Bitner waived this issue on appeal by not objecting to the trial court's ruling or raising the issue at trial. Generally, questions not raised in the trial court are deemed waived and cannot be argued for the first time on appeal. (*In re Marriage of Rodriguez* (1989), 131 Ill. 2d 273, 279, 545 N.E.2d 731, 733.) As a general rule, each party bears the obligation to raise issues and present evidence to be considered by the court. A party's failure to raise an issue results in the waiver of that issue. *In re Marriage of Jarvis* (1993), 245 Ill. App. 3d 1007, 1017, 614 N.E.2d 1294, 1301.

█ However, the rule of waiver is a limitation on the parties, not the courts. A reviewing court, in the exercise of its responsibility for a just result and the maintenance of a sound and uniform body of precedent, may consider issues not properly preserved by the parties. (*Geise v. Phoenix Co. of Chicago, Inc.* (1994), 159 Ill. 2d 507, 514, 639 N.E.2d 1273, 1276.) Reviewing courts may consider as plain error those assignments of error not preserved for review to the extent the parties cannot otherwise receive a fair trial or a deterioration of the judicial process occurs. Application of the plain error doctrine to civil cases should be exceedingly rare and limited to circumstances amounting to an affront to the judicial process. (*Allison v. Stalter* (1993), 251 Ill. App. 3d 127, 131, 621 N.E.2d 977, 979.) In an analogous situation, one court has held that a party did not waive review by failing to object to a judgment following a bench trial when the trial court disregarded the parties' stipulation in making its ruling. (*Donow v. Board of Trustees of Southern Illinois University* (1974), 21 Ill. App. 3d 139, 144, 314 N.E.2d 704, 707-08.) Similarly, we hold that Bitner did not waive this issue by failing to object to the trial court's judgment. Furthermore, if waiver had occurred, we would consider the issue because of plain error, for reasons discussed below.

█ On the merits of the issue, section 2—1110 of the Code of Civil Procedure governs directed judgments in bench trials:

> "Motion in non-jury case to find for defendant at close of plaintiff's evidence. In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered. If the ruling on the motion is adverse to the defendant, the defendant may proceed to adduce evidence in support of his or her defense, in which event the motion is waived." (735 ILCS 5/2—1110 (West 1994).)

This section requires the court to engage in a two-part test when ruling on a motion for a directed judgment. The trial court must first determine as a matter of law whether the plaintiff has made a *prima facie* case. If not, the court should dismiss the action. However, if the trial court determines the plaintiff has made a *prima facie* case, the court must weigh the evidence the plaintiff has presented. This weighing process may negate some of the required elements of the plaintiff's case. If an element has been negated, the court should grant the defendant's motion for a directed judgment. *In re Estate of Huffmon* (1994), 265 Ill. App. 3d 225, 229, 638 N.E.2d 235, 239.

694

The trial court erred in deciding the partnership accounting was fair and reasonable. A motion for a directed judgment tests only whether the plaintiff has presented a *prima facie* case. It cannot be the basis for a judgment for the plaintiff. Bitner should be given the opportunity to present evidence that the partnership accounting was not fair and equitable.

For reasons discussed above, the judgments of the trial court are reversed and the cause remanded for a new trial in accordance with this opinion.

Reversed and remanded with directions.

KNECHT, P.J., and GREEN, J., concur.