150 P.3d 622 (2007)
Dale LANG, Appellant/Cross-Respondent,
v.
Linda HOUGAN; Premier Property Management, Inc., a Washington corporation; Lang Property Management, Inc., a Washington corporation; and Lang Property Management, a general partnership, Respondent/Cross-Appellant.
No. 33591-3-II.
Court of Appeals of Washington, Division 2.
January 17, 2007.
*623 Helen C. Tompkins, Law Office of Helen Tompkins, Portland, OR, for Appellant/Cross-Respondent.
Ben Shafton, Vancouver, WA, for Respondent/Cross-Appellant.

OPINION PUBLISHED IN PART
PENOYAR, J.
¶ 1 Dale Lang appeals an order dividing the assets of Lang Property Management, Inc. (LPM), a property management and real estate investment company that he co-owned with respondent Linda Hougan. Lang argues that the trial court erred in concluding that Hougan did not breach her fiduciary duty when she solicited LPM's clients to switch their accounts to her new business. He also disputes the trial court's division of the real property holdings, and he claims that the trial court erred in: (1) finding that he breached his fiduciary duty, (2) making certain evidentiary and credibility rulings at trial, and (3) requiring him to post a cash supersedeas bond pending appeal. Hougan cross-appeals, arguing that Lang was judicially estopped from claiming an interest in one of the properties and that she should have been awarded attorney fees. We affirm, except that we hold that Hougan breached her fiduciary duty by soliciting clients, and we remand for a determination of Lang's damages.

FACTS
I. BACKGROUND
¶ 2 Lang and Hougan incorporated LPM on August 31, 1995. Although LPM never issued shares of stock, Lang and Hougan each owned an equal share of the corporation and each functioned as corporate officers and directors.
¶ 3 LPM had three components to its business. First, it managed rental properties for the owners. Second, it performed maintenance on the rental properties and billed the owners for the work performed. Third, it bought, sold, rented, and held real property as investments for its own profit.
A. The Real Properties
¶ 4 Lang and Hougan bought six properties together, either in their own names or through LPM. By the time this case went to trial, they had sold all but three of those properties: the duplex, the 44th Avenue property, and the 24th Circle property.
B. Financial Matters
¶ 5 Between December 2000 and March 2001, Lang loaned LPM a total of $55,000. No promissory note was ever signed, and Lang and Hougan never agreed on an interest rate or on when the loan would be repaid.
¶ 6 In the fall of 2001, LPM sold a house on Alki Road in Vancouver and put the proceeds into escrow. When Lang and Hougan split at the end of 2001, LPM owed over $50,000 on a U.S. Bank line of credit. As they were negotiating the distribution of LMP's assets in 2002, Lang insisted on receiving the proceeds from the sale of the Alki Road house for reimbursement of the $55,000 he loaned LPM. Hougan wanted to apply these proceeds to pay off the line of credit. The interest on the line of credit continued to accrue until Lang finally agreed to pay it in January 2003. By this time, the pay off amount had increased by $3,955.
C. LPM's Breakup
¶ 7 Hougan handled most of LPM's day to day operations by showing properties, writing checks, billing customers, and tracking the finances and accounting.
¶ 8 The relationship between Lang and Hougan began to decline in 2001 and got even worse around the time the Washington Department of Real Estate Licensing (DOL) began auditing LPM in July 2001. The audit revealed that LPM's real estate license listed the company as both "incorporated" and as "LLC", which is improper. 1B Report of Proceedings (RP) at 247-48.
¶ 9 In September 2001, Lang went to Olympia to try to fix the problem with LPM's license. Lang took a copy of LPM's original certificate of formation, which both he and Hougan had signed. Lang crossed off the word "Inc." and wrote in "LLC" so the company name read "Lang Property Management, *624 LLC." 1B RP at 168; Clerk's Papers (CP) at 42; Ex. 14 at 6. He then filed the certificate of formation with the Secretary of State, effectively creating a new company (the LLC).
¶ 10 At about the same time he created the LLC, Lang submitted a Broker's Closing Office Affidavit as to LPM and submitted an application to license the LLC with himself as the designated real estate broker. According to the DOL's records, Lang ceased to be an individual broker and became the designated broker for the LLC at this time; Hougan's license became inactive. Shortly after creating and licensing the LLC, Lang sent Hougan the paperwork so she could become licensed with the LLC.
¶ 11 For several weeks Hougan did not sign the paperwork transferring her license to the LLC. She was no longer comfortable in her relationship with Lang, she did not yet realize the full implications of Lang's actions in Olympia, and she did not understand why the paperwork was necessary. In late September, Hougan hired an attorney to create a company called Premier Property Management, Inc. (Premier), which was incorporated on October 8, 2001. Hougan testified that she had become uncertain about LPM's future and wanted to have something in reserve. Lang learned in early October that Hougan had established Premier.
¶ 12 That same month, Lang and Hougan discussed splitting the company and dividing the properties. In the meantime, Hougan continued LPM's business as usual, showing properties and representing property owners even though she knew she was not licensed to do so.
¶ 13 Lang and Hougan met in late October 2001 to try to resolve their differences. However, negotiations fell through and Hougan came away from the meeting believing that the business relationship was over. She decided to find another broker with whom to associate and to start Premier.
¶ 14 On November 12, 2001, Hougan sent letters to all of LPM's clients informing them that her partnership with Lang was ending and encouraging them to transfer their accounts to her. Lang learned of this within a few days. Lang and Hougan did not have a non-compete agreement.
¶ 15 Upon receiving Hougan's letter, most of LPM's clients transferred to Premier. With the clients' permission, Hougan transferred client funds from LPM's secure trust account to Premier. This transfer took place November 26, 2001, with a $61,300 withdrawal. Hougan did not tell Lang in advance that she was withdrawing this money from the trust account.
¶ 16 With most of the clients gone, LPM's property management business effectively ceased to operate. The Secretary of State administratively dissolved the LLC on December 23, 2002, and it dissolved LPM on November 24, 2003.
II. PROCEDURAL HISTORY
¶ 17 After the parties failed to negotiate a settlement, Lang sued Hougan and all the corporate entities involved seeking dissolution of LPM and claiming that Hougan transferred company assets to herself, breached her fiduciary duty, and failed to give him an accounting. A bench trial followed.
A. Trial Court Rulings
1. Judicial Estoppel
¶ 18 Hougan urged the trial court to find that Lang was judicially estopped from claiming an interest in the duplex because he had not listed the duplex in his divorce settlement. The trial court made no finding as to whether Lang's failure to include the duplex in the court required settlement documents was intentional or fraudulent on Lang's part. Instead, the court determined that Lang was not judicially estopped from claiming an interest in the duplex derivatively from LPM.
2. Comments on Myers's Credibility
¶ 19 In its oral ruling, the trial court stated that it discounted Myers's testimony:
And it is credibility. I saw it when I saw her react to when I tried to probe my own questions about the relationship between Mr. Stricklen and the roller skating. Her facial reaction, her body language, the *625 way she presented to me, it didn't smell right. It didn't pass the smell test. So I discount what she's saying.
5 RP at 1146.
3. Fiduciary Duty
¶ 20 The trial court found that Lang "killed the corporation" when he "removed" his broker's license. 5 RP at 1142. It acknowledged that this may not have been Lang's intent, but it found that LPM "stopped functioning at that point." 5 RP at 1142. It further found that Hougan was not a party to the LLC. Because LPM could no longer function, the trial court determined that the clients were "up for grabs." 5 RP at 1144. In its written findings of fact, the court also acknowledged that LPM was never licensed as a real estate broker.
¶ 21 The trial court did not assign blame to either party, telling both Lang and Hougan, "You did the best you could under the circumstances," and, "I don't think the two of you were bad people trying to rip each other off." 5 RP at 1146, 1157. The court concluded that Hougan did not violate the corporate opportunity doctrine and was not guilty of conversion or breach of fiduciary duty.
¶ 22 The trial court decided to divide LPM's assets "in such a way as to recognize the contributions of the parties." CP at 52. It awarded Lang and Hougan the amounts they were owed in dividends and reimbursed them money they paid out of pocket on behalf of LPM, including Lang's $55,000 loan and amounts Hougan charged to her Visa card. It also determined that Lang breached his fiduciary duty to LPM by resisting paying off the U.S. Bank line of credit. The court assessed him the extra amount that Hougan had to pay in interest because of his delay.
4. Division of Real Properties
¶ 23 The trial court awarded the 44th Avenue property to the Hougans, finding that Hougan made the down payment from her own funds. The trial court also found that rentals from the 44th Avenue property were used to reduce the principal balance on the obligation secured by a deed of trust. Therefore, the trial court awarded Lang 50 percent of this reduction in principal, which amounted to $2,877.
¶ 24 The trial court ordered the duplex and the 24th Circle properties to be sold and the proceeds divided equally between the parties.
C. Cash Supersedeas Bond on Appeal
¶ 25 Lang sought to stay the sale of the real properties during appeal. Hougan objected, claiming that Lang should comply with the supersedeas procedure in RAP 8.1 and post a bond.[1] She claimed that the current real estate market was a "bubble" and that property values could drop while this case was pending on appeal. RP (Aug. 19, 2005) at 8. Lang argued in response that Hougan had not met her burden of showing that her loss would be more than the properties' value. The trial court ordered Lang to either sell the properties or post a $60,000 bond.
¶ 26 Lang chose to post this amount in cash with the court clerk. He then moved this court to vacate supersedeas. A Division Two commissioner denied Lang's motion by order entered on October 7, 2005.
¶ 27 Lang now appeals, claiming the trial court erred in these rulings. Hougan cross appeals, claiming that Lang is judicially estopped from claiming an interest in the duplex and that she is entitled to attorney fees.

ANALYSIS
I. FIDUCIARY DUTY, CORPORATE OPPORTUNITY, AND CONVERSION
¶ 28 The trial court concluded as a matter of law that Hougan was not guilty of any conversion or breach of fiduciary duty, but the written order did not explain the basis for this conclusion. We therefore refer to the trial court's oral decision to ascertain the legal and factual bases upon which the trial court predicated its findings. Nord v. Eastside *626 Ass'n Ltd., 34 Wash.App. 796, 798, 664 P.2d 4 (1983).
¶ 29 The trial court's oral ruling indicated that it believed LPM ceased to exist when Lang withdrew his broker's license and created the LLC. It found that Hougan essentially had no part in the LLC because she had not consented to its formation. Therefore, the court stated, "[w]hether I apply corporate law or I apply partnership law, there is a disassociation under one, there is estopping of its ability to function of the other." 5 RP at 1143. The court found that Lang and Hougan had each created their own companies and that each was free to pursue former clients.
¶ 30 We find error with the trial court's conclusions that (1) Lang's withdrawal of his broker's license caused LPM to cease to exist and (2) that Lang and Hougan owed no duty to each other because the duty no longer existed.
A. Substantial Compliance with Licensing Statutes
¶ 31 We review the trial court's conclusions of law de novo, See In re the Disciplinary Proceeding Against Haley, 156 Wash.2d 324, 333, 126 P.3d 1262 (2006), and hold that the trial court erred in concluding that Lang's withdrawal of his broker's license rendered LPM unable to serve its clients, making the corporation no longer able to engage in business. Because LPM was never properly licensed as a real estate broker, there was no license for Lang to withdraw; establishing the LLC had no legal effect on LPM. None of the technical violations of licensing laws relieved Hougan of her duties toward LPM. See Williamson, Inc. v. Calibre Homes, Inc., 147 Wash.2d 394, 403-04, 54 P.3d 1186 (2002).
¶ 32 This court applied the doctrine of substantial compliance because holding otherwise "would stress form over substance and could transform a socially desirable licensing scheme `into an unwarranted shield for the avoidance of a just obligation.'" Williamson, 106 Wash.App. 558, 570, 23 P.3d 1118 (2001) (citing Andrews Fixture Co. v. Olin, 2 Wash.App. 744, 749-50, 472 P.2d 420 (1970)). The Washington Supreme Court upheld this decision. Williamson, Inc. v. Calibre Homes, Inc., 147 Wash.2d 394, 54 P.3d 1186.
¶ 33 Although we prefer full compliance with all laws, we hold that Lang's technical noncompliance did not automatically relieve Hougan of her duties to LPM and to Lang, just as Williamson's noncompliance did not relieve its client from the duty to pay for the services rendered.
B. Breach of Fiduciary Duty to a Dissolving Corporation
¶ 34 We apply corporate law because the trial court specifically found that LPM was a subchapter S corporation, and Lang did not assign error to this finding.
¶ 35 Conversion is the unjustified, willful interference with a chattel which deprives a person entitled to the property of possession. In re Marriage of Langham, 153 Wash.2d 553, 565, 106 P.3d 212 (2005). "Chattel" includes both tangible and intangible goods, such as corporate property. See Langham, 153 Wash.2d at 565, 106 P.3d 212. Directors and officers are required by Washington's Business Corporation Act to discharge their duties to the corporation in good faith; if a director or officer converts corporate property, she has breached that duty to operate in good faith. See RCW 23B.08.300 and .420.
¶ 36 The trial court here found no breach because it found that Lang's and Hougan's fiduciary duties no longer existed. Whether a legal fiduciary duty exists is a question of law which we will review de novo. S.H.C. v. Sheng-Yen Lu, 113 Wash.App. 511, 524, 54 P.3d 174 (2002).
¶ 37 We hold that Hougan and Lang continued to have a fiduciary duty to each other and to LPM while the business was breaking apart. According to Washington law, "[a] dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business." RCW 23B.14.050(1). "[D]issolution of a corporation does not . . . [s]ubject its directors or officers to standards of conduct different from those prescribed in [the Washington Business Corporation Act]." RCW 23B.14.050(2)(c).
¶ 38 LPM's corporate form and licensing were therefore not relevant to this analysis. *627 See RCW 23B.14.050(2)(c); see also White v. Dvorak, 78 Wash.App. 105, 896 P.2d 85 (1995) (a contract made in the name of a dissolved corporation may be enforced, even though a dissolved corporation cannot enter into contracts). The trial court erred in determining that Hougan owed no duty to LPM while her relationship with Lang was disintegrating.
¶ 39 The trial court seemed to believe that LPM's clients did not constitute a corporate asset that must be fairly divided. This ignores the realities of business, where the accounts are often a transferable asset despite the clients' lack of obligation to continue working with the business's successor. See Texas Truck Agency v. Cure, 110 F.3d 286, 289-90 (5th Cir.1997).
¶ 40 Courts have long recognized that a business's customer base, or "goodwill," is a commodity on which one may place a monetary value. E.g., Berg v. Settle, 70 Wash.2d 864, 868-69, 425 P.2d 635 (1967). To the extent that Hougan solicited LPM's clients without giving Lang fair compensation, we hold that she converted a corporate asset and hereby breached her fiduciary duty. See Dowell v. Bitner, 273 Ill.App.3d 681, 691-92, 210 Ill.Dec. 396, 652 N.E.2d 1372 (1995) (corporate officer and director's solicitation of customers before his resignation was effective constituted a breach of fiduciary duty); Smith-Shrader Co. v. Smith, 136 Ill.App.3d 571, 580, 91 Ill.Dec. 1, 483 N.E.2d 283 (1985) (officer breached fiduciary duty by soliciting key clients and former employees).
¶ 41 Accordingly, we remand this case and direct the trial court to award Lang his share of the goodwill that Hougan converted.
¶ 42 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
HOUGHTON, C.J., and BRIDGEWATER, J.
NOTES
[1] RAP 8.1(b)(2) allows a party to obtain a stay of enforcement of a decision "affecting rights to possession, ownership or use of real property . . . by filing in the trial court a supersedeas bond or cash, or alternate security approved by the trial court . . ." RAP 8.1(b)(2).