**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STEVE H. KIM, M.D., an individual, | ) | No. 76927-8-I |
| Respondent, | ) ) | DIVISION ONE |
| v. | ) ) | |
| JAY M. FRIEDMAN, M.D., an individual and his marital property thereof; PACIFIC RETINA SPECIALISTS, P.S., a Washington professional services corporation; and JENNIFER FRIEDMAN, an individual and her marital property thereof, | ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Appellants, | ) ) | |
| and | ) ) | |
| STEVE H. KIM, M.D., and WENDY YEUNG KIM, a marital community, | ) ) ) | |
| Respondents. | ) ) | FILED: May 28, 2019 |
| _____ | ) | |

LEACH, J. — Jay Friedman appeals the trial court's dismissal of his claims against Steve Kim for breach of fiduciary duty, breach of contract, and tortious interference. Friedman does not have standing to pursue these claims. His claims are derivative of his status as a shareholder of Pacific Retinal Specialists

(PRS) and do not fall within an exception to the shareholder standing doctrine. We affirm.

FACTS

Dr. Steve Kim and Dr. Jay Friedman are ophthalmologists. Friedman formed Pacific Retina Specialists P.S. (PRS) in 1997.[1] It provided medical and surgical treatment of retinal disease. Friedman later hired Kim as an associate physician. In 2008, Friedman offered Kim the opportunity to become a PRS shareholder. After Kim agreed, they signed four agreements establishing their relationships with PRS and between themselves: a buy-sell agreement (BSA),[2] a shareholder agreement, a stock purchase agreement, and individual shareholder physician employment agreements (SPEAs). After they signed these agreements, Friedman and Kim each owned 50 percent of the shares in PRS. PRS later experienced financial difficulties that led to this litigation.

Buy-Sell Agreement Provisions

The BSA addressed buyout rights, procedures for voluntary dissolution, and governance. It named Friedman president of PRS with "the broadest discretion possible in the management of the business and affairs of the Corporation." The parties agreed that because Friedman founded PRS's

---

[1] From 1994 to 1997, prior to incorporation, PRS was called "Jay M. Friedman, M.D., P.S." PRS was incorporated under chapter 18.100 RCW.

[2] The stock purchase agreement, executed at this time, states that the BSA had to be executed first.

practice, upon any corporate dissolution, he would be entitled to receive, after payment of all corporate debts and costs of sale, certain key assets, including the noncompete provisions restricting each shareholder.

The BSA had a noncompete clause that prohibited any shareholder from "engag[ing] in any activity that competes with the interests of Corporation within King, Snohomish, Skagit, or Whatcom counties or any other county in which Corporation maintains a medical office that is in operation during the term of [the BSA]" during his employment or for three years after it ended. This restriction protected PRS, "any affiliate or other related entity," and any successor to PRS's rights and liabilities. Except as stated in the BSA, this restriction survived the termination of the BSA.

The BSA states that it terminates "upon the occurrence of the earliest of the following events, or as otherwise provided by law; (i) The dissolution, Chapter 7 bankruptcy or receivership of the Corporation; (ii) The Corporation ceases to conduct any business operation; (iii) The written consent of all Shareholders."

Shareholder Physician Employment Agreement Clauses

The SPEAs between each doctor and PRS established their relationship as "an employment relationship [that] shall not be construed to create any relationship of partnership or joint venture." Each SPEA included a noncompete clause nearly identical to the BSA noncompete provision. The SPEA

noncompete clauses survived the termination of the agreement and/or the corporate dissolution of SPR. If a corporate dissolution of SPR occurred, the noncompete clauses automatically transferred to the entity acquiring the key assets of PRS, as provided in the BSA. And PRS could assign the noncompete clauses to a purchaser or successor in interest to its medical practice without the employee's consent.

Procedural History

In the years after Kim became a shareholder, PRS ran into serious financial difficulties. Kim and Friedman each blamed the other for these problems. They could not agree how to best manage PRS.

In December 2014, Kim sued Friedman and PRS for breach of fiduciary duties and asked the court to dissolve PRS under RCW 23B.14.300(2)(a). He also asked the court to appoint a receiver under RCW 7.60.025(1)(a) and 23B.14.310(3) and to void his noncompetition agreements with PRS. In response, Friedman sued Kim. Among other requests, he asked the court to declare that PRS could enforce the noncompete clauses against Kim.

Then Kim asked the court to appoint a general receiver pending the entry of an order of judicial dissolution. In April 2015, the trial court denied this request and appointed a custodial receiver to maintain the status quo and create a

"successful debt repayment plan." It also ordered the parties to mediate their dispute.

In June 2015, the custodial receiver asked the court for guidance, modification of the receivership order, and/or termination of the receivership. He said that PRS was not a viable business and was unlikely to change into one in the future. He did not anticipate that mediation would "serve a meaningful purpose or lead to any resolution of the issues." He believed the receivership could not fulfill its purpose and asked for the court's guidance.

Later that month, the trial court ordered the parties to participate in mediation "for the limited purpose of determining how to best liquidate the assets of the business, handle its debts and wind it down." If they failed, they were to return for a court-imposed resolution.

In July 2015, the trial court ordered a court-supervised dissolution of PRS pursuant to RCW 7.60.025(t), RCW 7.60.025(u), and RCW 23B.14.300. It appointed a general receiver to wind up PRS's business with the power and authority identified in RCW 7.60.060. It retained jurisdiction over PRS pursuant to RCW 7.60.055. It instructed Kim and Friedman to continue practicing with PRS until July 15, 2015. It suspended the noncompete clauses in the BSA and

the SPEAs for 60 days starting on July 2, 2015.[3]  The suspension applied only to existing patients.

At the end of July 2015, Kim asked the trial court to declare the noncompete clauses of the BSA and the SPEAs unenforceable.  The trial court denied Kim's request.  The court decided that Friedman had standing to assert the validity of the noncompete agreements because of his possible personal liability on corporate debts not paid through either a corporate or judicial dissolution.  It also decided that Kim had not shown any basis to invalidate the noncompete agreements under chapter 7.60 RCW, Title 23B RCW, or the language of the BSA.

But the trial court also decided that the judicial dissolution of PRS under RCW 23B.14.300 meant that the BSA provision giving Friedman the right to key assets in case of corporate dissolution did not apply.  And the court decided that the general receiver had control over all PRS assets, including the right to enforce the noncompete agreements.

---

[3] The trial court stated that Friedman and Kim could "practice medicine and provide retinal surgical services to patients in the counties where the Corporation [maintained offices at that time] without restriction, including, without limitation, as an employee or independent contractor of a competing medical practice, notwithstanding those Restrictive Covenants[,] to the extent necessary to maintain continuity of care for current patients."  It also stated that "[n]either the parties nor the practices accepting referrals shall incur liability for making or accepting referrals during this 60-day time frame."

The receiver then agreed, subject to court approval, to release Kim from the noncompete agreements for $25,000 plus Kim's waiver of claims for unpaid wages and bonuses, postreceivership earnings, and a mutual release of all claims. In August 2015, the trial court approved this agreement after finding it was "in the best interest of the receivership estate." Kim then joined another medical practice. The receiver wound up PRS's affairs. Because PRS had insufficient assets to pay creditors' claims in full, the receiver did not distribute any assets to the shareholders.

Later, Friedman asked the court to decide if his counterclaim asserting Kim violated a fiduciary duty could survive a CR 12(b)(6) motion. The trial court decided it would not because it was derivative of his status as a PRS shareholder. Because Friedman did not have standing to assert it, the court dismissed it with prejudice.

Friedman then asked the court for permission to amend his counterclaim against Kim to include claims for breach of contract, tortious interference with contract and business expectancies, and breach of fiduciary duty. The court granted his request for all these claims except the one for breach of fiduciary duty. The trial court decided that while Friedman had recast his dismissed claim to allege harm to a shareholder caused by Kim's conduct as an officer or director

instead of a shareholder, the claim was still derivative of his shareholder status, so he did not have standing to assert it.

In April 2017, after discovery, Kim asked the court to dismiss Friedman's claims on summary judgment. In May 2017, the court granted this request. It concluded that Friedman's claims were all derivative of his status as a shareholder with Kim and Friedman had no standing to assert them. Friedman has appealed.

## STANDARD OF REVIEW

This court reviews de novo an order dismissing a claim for failure to state a claim on which a court can grant relief.[4] A court properly dismisses a claim on this basis if the claimant cannot prove any set of facts consistent with the claim that would entitle that party to relief.[5]

This court reviews an order on summary judgment de novo.[6] It considers all facts and reasonable inferences in the light most favorable to the nonmoving party.[7] It awards summary judgment only if the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[8]

---

[4] FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 180 Wn.2d 954, 962, 331 P.3d 29 (2014).
[5] Bravo v. Dolsen Cos., 125 Wn.2d 745, 750, 888 P.2d 147 (1995).
[6] CR 56(c); Sabey v. Howard Johnson & Co., 101 Wn. App. 575, 581-82, 5 P.3d 730 (2000).
[7] CR 56(c); Sabey, 101 Wn. App. at 582.
[8] CR 56(c); Sabey, 101 Wn. App. at 582.

This court also reviews the trial court's interpretation of a contract de novo, provided that contract does not require resort to extrinsic evidence.[9]

ANALYSIS

Friedman claims that Kim violated the noncompete provisions of the BSA and his SPEA, obtained dissolution of PRS to void these contracts, and wrongly diverted clients away from PRS. These actions, according to Friedman, deprived him of the livelihood, patient goodwill, and business expectancy he received through PRS and left him vulnerable as the primary guarantor of PRS's debts. He claims that he may personally enforce the noncompete provisions of the BSA and SPEA. He also claims that he has standing to sue Kim for breach of fiduciary duty and tortious interference.

Friedman asserts personal claims for his individual benefit rather than derivative claims on behalf of PRS because the proceeds of derivative claims would belong to PRS's unpaid creditors. But his injuries derive from the harm to PRS. Friedman does not show that he has an individual right to recover damages for breach of the noncompete agreements. For his other claims, he does not show that Kim owed him a special duty or that he was injured in a manner separate and distinct from PRS or Kim. His claims fail.

---

[9] Wash. State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Constr. Co., 176 Wn.2d 502, 517, 296 P.3d 821 (2013).

## Individual Right To Enforce Restrictive Covenant

Friedman challenges the trial court's conclusion that only PRS could recover damages for any breach by Kim of the BSA noncompete clause. He claims the contract confers upon him a right coextensive with PRS to enforce it against Kim, so the trial court could not order Kim's release without his input.[10]

One individual must have standing to assert a claim to another individual on that claim.[11] Standing requires that the party making the claim has a personal stake in the outcome of the case.[12] With limited exceptions, "a shareholder cannot sue for wrongs done to a corporation, because the corporation is a separate entity."[13] Instead, the shareholder must bring a derivative suit on behalf of the corporation. Even when a shareholder owns most or all of a corporation's shares, he still cannot sue as an individual if he suffers damages indirectly as a result of a primary injury to the corporation.[14]

For this reason, Friedman cannot claim damages caused by any breach of Kim's SPEA by Kim. This contract is between Kim and PRS and establishes Kim's status as an employee. Friedman was not a party to it. Since PRS did not

---

[10] Friedman does not take issue with the trial court's determination that the right to enforce the noncompete contract was an asset to be disposed of by the receiver. He claims, instead, that he has a right to enforce even if it is sold to another party who may or may not decide to enforce it.

[11] Sabey, 101 Wn. App. at 584.

[12] Sabey, 101 Wn. App. at 584.

[13] Sabey, 101 Wn. App. at 584.

[14] Sabey, 101 Wn. App. at 584.

pay Kim or Friedman in the weeks before the dissolution, PRS likely breached the SPEA, raising questions about its ability to enforce it. But if the SPEA noncompete provision remained enforceable, the SPEA provides it automatically transferred to and became enforceable by the party succeeding to PRS's key assets. Here, that is the receiver and not Friedman.[15]

Friedman focuses primarily on his claimed right to enforce the BSA's noncompete clause. Kim's alleged breach of this provision would cause injury to PRS. Friedman's claim suffers from the same defect as his claim under the SPEA. But Friedman asserts that the parties to the BSA intended that he have an individual right to recover damages for a breach of its noncompete clause.

RCW 23B.07.320 provides for enforcement of agreements among shareholders. Thus, if two shareholders contract with each other, that agreement may be enforced provided it is "not contrary to public policy and that [it] complies with" RCW 23B.07.320.[16] Washington courts "'follow the objective manifestation theory of contracts,'"[17] so this court "focus[es] on the agreement's objective manifestations to ascertain the parties' intent."[18] The court looks to the face of

---

[15] It is only passed on as a key asset "[i]n the event of the corporate dissolution of [PRS]."

[16] RCW 23B.07.320(1).

[17] Kelley v. Tonda, 198 Wn. App. 303, 311, 393 P.3d 824 (2017) (quoting Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005)).

[18] Martin v. Smith, 192 Wn. App. 527, 532, 368 P.3d 227 (2016).

the agreement, but when the language is ambiguous, it may also look to extrinsic evidence of intent.[19]

Friedman contends that the language of the BSA provides clear evidence of the "mutual intent that Dr. Friedman would have an individual right to enforce Dr. Kim's covenant not to compete." He further asserts that reading the BSA in context with the stock purchase agreement and Kim's SPEA buttresses his claim.

The BSA states that the noncompete provision is for the benefit of the corporation. It does not describe Friedman as a beneficiary. The noncompete provision contains a definition of "Corporation" that includes "any affiliate or other related entity of the Corporation, and any successor to rights and liabilities of the Corporation." The general receiver, not Friedman, succeeded to PRS's rights and liabilities. The noncompete provision forbids the shareholders from "engag[ing] in any activity that competes with the interests of" PRS. It does not forbid activity that competes with any interest of Friedman. In the BSA, each shareholder acknowledged that the noncompete provision benefitted PRS, not Friedman.

Friedman points to a BSA provision that states, "[T[he Corporation or non-violating Shareholder . . . shall be entitled to injunctive and other equitable relief to prevent or curtail any breach of any provision of this Agreement." But this

---

[19] Kelley, 198 Wn. App. at 312.

provision follows directly on the language stating the "essential" nature of the noncompete provision "to the Corporation." The cited BSA provision allows a nonviolating shareholder to seek equitable relief only to protect PRS.

Similarly, Friedman suggests a BSA provision stating "that irreparable injury would be caused to the Shareholders and the Corporation by failure to comply with the terms of this Agreement" shows an intent to provide Friedman an individual enforcement right. But nothing in this provision suggests an intent to create a claim for a shareholder's individual injury. Instead, this provision refers to injuries directly to PRS.

The BSA provision that entitles Friedman to "key assets" upon corporate dissolution does not help him because the court dissolved PRS due to its insolvency. PRS did not dissolve through the statutory corporate dissolution process. And the parties' inclusion of contract language entitling Friedman to key assets, including the noncompete rights, upon a corporate dissolution strongly suggests that he did not have any right to enforce the noncompete clause under other circumstances. Finally, the BSA requires corporate assets, including key assets, to be used to pay off the corporate liabilities before any distribution to shareholders.

Friedman asserts that allowing only PRS to enforce the noncompete provision makes certain provisions in the BSA, the SPEAs, and the stock

purchase agreement "meaningless." He specifically identifies the provisions of the BSA and the SPEAs providing for the survival of the noncompete provisions after the termination of PRS. But survival of this asset protects PRS's successor and creditors, as it did here. So the trial court's interpretation that only PRS could enforce the noncompete contracts did not render other provisions "meaningless" but instead harmonizes them.

The BSA did not provide Friedman with a coextensive right to enforce the covenant.

### Breach of Fiduciary Duty

Friedman asserts that Kim breached a fiduciary duty to him. He contends his claim fits into an exception to the shareholder standing rule because Kim owed him a special duty and his injury was separate and distinct.

An individual who would typically be barred from suit by the shareholder standing rule may sue if one of two overlapping exceptions apply.[20] One exception arises when the defendant owes the plaintiff a special duty, for example, through a contract.[21] The other exception occurs if "the shareholder suffered an injury separate and distinct from that suffered by other shareholders."[22]

---

[20] Sabey, 101 Wn. App. at 584.
[21] Sabey, 101 Wn. App. at 584-85.
[22] Sabey, 101 Wn. App. at 584-85.

The injuries Friedman asserts include his loss of livelihood, patient base, ability to care for patients, and patient goodwill. These are direct and consequential injuries that flow from the financial insolvency of PRS and its judicial dissolution. Friedman did not assert a derivative claim and failed to show that his claim fits an exception to the shareholder standing rule. He does not have standing, and the trial court properly dismissed this claim.

   i.  Special Duty Exception

Friedman first contends that the special duty exception to the shareholder standing rule applies. The special duty exception requires a duty be owed to the plaintiff as an individual independent of his status as a shareholder.[23]  In Sabey v. Howard Johnson & Co.,[24] for example, the misrepresentation made to Sabey's counsel by Howard Johnson breached a personal duty owed to Sabey separate from the corporation because he personally relied upon the misrepresentation before purchasing the corporation.

Friedman does not assert that Kim owed him a duty outside of their relationship vis-á-vis PRS. And he does not explain how Kim owed this duty when the BSA gave Friedman full discretion to manage the corporation as its president. Instead, Friedman asserts that the status of PRS as a closely held

---

[23] Sabey, 101 Wn. App. at 585.
[24] 101 Wn. App. 575, 584-85, 5 P.3d 730 (2000).

corporation created a special duty between the two shareholders during judicial dissolution.

Friedman relies on Lang v. Hougan[25] to support this assertion. Lang involved a suit by a partner in a property management company for breach of fiduciary duty.[26] The co-owner claimed that the breach occurred because Lang solicited clients for a different company during the dissolution of their management company.[27] Friedman suggests that the court's statement that the duties of officers and directors of a corporation did not vanish during dissolutions[28] supports his contention about a special duty owed to him.

But we distinguish Lang. The State administratively dissolved the parties' company, and no receiver wound up its affairs.[29] The special duty the court identified existed between the two shareholders because they shared responsibility for winding up the corporation's affairs. Further, the Lang court focused on error with the lower court's determination that the corporation no longer existed during dissolution and its failure to identify the corporation's clients as an asset.[30] The trial court here recognized the status of the noncompete

---

[25] 136 Wn. App. 708, 714, 718-19, 150 P.3d 622 (2007).
[26] Lang, 136 Wn. App. at 710.
[27] Lang, 136 Wn. App. at 710.
[28] Lang, 136 Wn. App. at 718-19.
[29] Lang, 136 Wn. App. at 713.
[30] Lang, 136 Wn. App. at 718-19.

provision as an asset and approved of its liquidation by the general receiver to benefit creditors.

Friedman also cites cases from jurisdictions outside of Washington. Most of these cases involve corporate dissolution or buyouts. None provide precedential or persuasive authority to support the proposition that a shareholder has a special duty to another shareholder when a court dissolves a close corporation due to insolvency. Similarly, Friedman provides no compelling policy reason why such a duty should exist.

Friedman fails to show Kim owed him a special duty.

ii. Separate and Distinct Injury Exception

Friedman also asserts that he should be able to sue as an individual because he suffered a separate and distinct injury.

The second exception to the shareholder standing rule requires the plaintiff to show his injury was not simply a consequence of harm to the corporation and that it was substantively different from that suffered by other shareholders.[31] A plaintiff asserting injury as a guarantor must similarly demonstrate a distinct and different injury prior to being able to assert an independent action.[32]

---

[31] Sabey, 101 Wn. App. at 584-85; Woods View II, LLC v. Kitsap County, 188 Wn. App. 1, 22-23, 352 P.3d 807 (2015).

[32] Sabey, 101 Wn. App. at 584-85.

Friedman cites as his distinct injuries the "(1) loss of gainful employment, (2) personal liability for PRS's debts, and (3) loss of the "Key Assets" identified in the [BSA]." All of these flow from the dissolution of PRS, and most are the same to those Kim suffered. He provides only conclusory statements to support his contention that his injury was distinct.

Both Kim and Friedman lost gainful employment. While Friedman claims that he is in a much worse position than Kim in terms of being able to find employment, he does not provide any support for that contention apart from claiming that his age precludes his ability to find new work. While Kim found immediate employment after dissolution, Friedman provided no evidence that he sought employment.

Friedman also points to his status as the sole personal guarantor on the company's credit cards and all but one of the real estate leases to show a separate, distinct injury from that of Kim. However, being a personal guarantor is not sufficient to support an independent action. The guarantor "'must show a distinct and different injury before an independent action can be maintained.'"[33] Friedman did not do so here.

---

[33] Woods View II, 188 Wn. App. at 23 (quoting Miller v. U.S. Bank of Wash., N.A., 72 Wn. App. 416, 423, 865 P.2d 536 (1994)). In Sabey, the court distinguished a statutory guarantor, which Sabey was, from a personal guarantor, which Friedman is. Sabey, 101 Wn. App. at 586.

Friedman's assertion that he was injured by the loss of a key asset fails as well. The trial court found Kim's covenant was a corporate asset and approved its sale to pay off corporate debt that Friedman had guaranteed. Since Friedman fails to show that he has a coextensive right to enforce the covenant, he fails to show that he was injured in a manner separate and distinct from the corporation.[34]

Friedman does not have standing to assert breach of fiduciary duty.

### Tortious Interference

Friedman contends that "Kim dissolved PRS for the wrongful purpose of voiding his non-compete and transferring PRS's patients to its main competitor to enrich himself at Dr. Friedman's expense" and that the trial court erred by dismissing his claim for tortious interference.

A shareholder does not have standing to assert a personal cause of action for tortious interference if the injury he asserts is the result of injury to a corporation.[35] He must bring a derivative suit.

Friedman claims he was injured by being deprived of the benefits of his employment contract with PRS and with his business expectancy because he

---

[34] Further, the noncompete clause as an asset garnered $25,000, $5,000 more than that identified for the aggregate of the key assets in the BSA § 3.01(c). Friedman, as a guarantor, arguably benefitted from the sale of this asset to offset PRS's liabilities.

[35] Sabey, 101 Wn. App. at 584.

was a guarantor on PRS's debts. But these injuries are the consequence of the dissolution of PRS. Friedman does not assert his claim fits an exception to the shareholder standing doctrine and, as discussed above, the circumstances in this case do not provide such an exception.

Friedman suggests this court look to <u>Kademian v. Marger</u>,[36] an Ohio case. That case involved two physician shareholders in a closely held corporation with Marger the majority shareholder and Kademian the minority shareholder.[37] Apart from not being Washington law, the case involves very different facts. Marger dissolved the corporation unilaterally.[38] Here, the parties were 50-50 co-owners. Friedman was, according to the BSA, the managing partner, and the dissolution was the result of a court order. Indeed, <u>Kademian</u> highlights the problem with Friedman's underlying claim. Friedman does not challenge the court's dissolution of PRS. So how is it possible that Kim wrongfully dissolved it?

Friedman did not have standing to assert the tortious interference claim.

## CONCLUSION

We affirm. Friedman fails to show that the trial court erred in dismissing his claim of breach of contract, breach of fiduciary duty, and tortious interference. He does not demonstrate that he has a personal right to enforce the noncompete

---

[36] 2014-Ohio-4408, 20 N.E.3d 1176 (Ct. App.).
[37] <u>Kademian</u>, 20 N.E.3d at 1178.
[38] <u>Kademian</u>, 20 N.E.3d at 1183.

provision against Kim. He does not have standing to assert a claim for breach of fiduciary duty or tortious interference.

Leach, J.

WE CONCUR:

Chun, J.

Dwyer, J.