2026 IL App (1st) 250815

No. 1-25-0815

Opinion filed June 4, 2026

Fourth Division

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| JOSEPH JOHN BREDEMANN, Trustee of the Joseph John Bredemann Revocable Trust; TIMOTHY J. BABINGTON, Trustee of the JJB Trust and the Joseph Meacham Trust; FRANK E. TRAGER and JOSEPH JOHN BREDEMANN, Co-Trustees of the John Meacham Trust, on Their Own Behalf and Derivatively on Behalf of B-Team Remedies Limited Partnership, an Illinois Limited Partnership, | ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court Of Cook County.<br><br><br><br><br><br><br><br>No. 2020 CH 05196 |
| Plaintiffs and Third-Party Defendants-Appellants, | ) ) ) | |
| v. | ) ) | |
| THOMAS P. BREDEMANN, and B-TEAM REMEDIES LIMITED PARTNERSHIP, an Illinois limited partnership, | ) ) ) ) | Honorable Thaddeus L. Wilson, Judge, Presiding. |
| Defendants and Third-Party Plaintiffs-Appellees | ) ) ) | |
| (Joseph Trust, MJB Trust, Matin Trust, Martin Meacham Trust, MBT Trust, Mary Trust, Mary Meacham Trust, and Trustees, Kathleen McDonnell Bredemann, and S. Tinsley Preston, | ) ) ) ) ) ) ) | |
| Third-Party Defendants). | ) | |

PRESIDING JUSTICE NAVARRO delivered the judgment of the court, with opinion.
Justices Ocasio and Quish concurred in the judgment and opinion.

**OPINION**

¶ 1 This action involves a dispute relating to the management of B-Team Remedies Limited Partnership (B-Team). The limited partners of B-Team are 11 trusts that benefit four members of the Bredemann family (Joseph or Joe Bredemann, John Bredemann, Martin Bredemann, and Mary Ann Bredemann). Tom Bredemann, another member of the family, is the general partner of B-Team. Plaintiffs—the trustees on Joe's and John's trusts (Joe and John), and derivatively on behalf of B-Team—filed a complaint against defendants B-Team and Tom, alleging claims for judicial expulsion of Tom, breach of fiduciary duty, and breach of contract of B-Team's Limited Partnership Agreement (LPA). B-Team filed a counterclaim against B-Team's limited partners, alleging breach of contract of the LPA for their failure to respond to an April 30, 2020, capital call.

¶ 2 The court granted summary judgment in favor of defendants on plaintiffs' claims. The court also granted summary judgment in favor of B-Team on its motion for partial summary judgment on its counterclaim against the limited partners. The court initially ordered the judicial dissolution of B-Team, but then it later vacated that order. The court also subsequently ordered the limited partners to pay their respective amounts owed under the capital call. Plaintiffs now appeal those orders. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4 The Bredemann family owns and operates car dealerships and related real estate throughout the Chicago area. In 1999, B-Team was formed to benefit its limited partners, which are 11 trusts owned by and benefiting either Joe, John, Martin, or Mary Ann. These 11 trusts are the shareholders in the Bredemann family's various car dealerships and related real estate development projects. B-Team held insurance policies on the lives of Joe, John, Martin, and Steven

Travnik (Travnik), who are the owners of the Bredemann car dealerships through their own or their spouse's (Mary Ann) respective trusts. Under the LPA, in the event of the death of one of these individuals, the insurance policy insuring that deceased individual would provide the other limited partners the capital to buy out that individual's equity interests in the Bredemann car dealerships and related real estate projects.

¶ 5                                     A. Complaint

¶ 6        In July 2020, Joe and John—through their trusts, and derivatively on behalf of B-Team filed a complaint against Tom and B-Team—alleged claims for judicial expulsion of Tom, breach of fiduciary duty, and breach of contract. They alleged as follows. B-Team's purpose was to own and hold life insurance policies for the benefit of the owners of the Bredemann family car dealerships and related real estate. The purpose of these policies was to provide "capital to facilitate the buyout of a deceased partner's equity interest in the dealerships." The policies, most of which were issued 20 years ago, offered millions of dollars in life insurance coverage, but Tom, the general manager of B-Team, failed to keep B-Team's life insurance policies current due to his bad faith mismanagement.

¶ 7        Plaintiffs alleged that Tom did "virtually nothing in two decades" as general partner and that Joe was forced to write premium checks on behalf of B-Team and advance $171,000 for premiums through loans from Adelphi Enterprises Limited Partnership, d/b/a Bredemann Lexus. Plaintiffs alleged that, by late 2017, B-Team was out of cash to keep the life insurance policies current. As a result, the premium payments on the policies were chronically overdue, and some policies lapsed into the grace periods. They alleged that, in 2017, Joe began to work with an insurance broker on a possible solution or exit strategy for B-Team, which included the recommendation that the partners "consider having the policies rolled out from B-Team to the

individuals," such that they could decide whether to keep their own policies. Joe, John, Travnik, and Mary Ann were in favor of the solution, but Tom refused to take any action. Also, in 2017, Tom was "openly hostile" to Joe and John, as he assaulted John at the Bredemann Chevrolet showroom and, before that incident, he wrote an e-mail to Joe stating, "You are both killing your mother," and "Dad is rolling over in [h]is grave wanting to strangle [t]he both of you."

¶ 8      Plaintiffs further alleged that, on November 18, 2019, the Bredemann Lexus dealership was sold, which terminated Martin's employment at that dealership and, consequently, his withdrawal as an equity owner in the Bredemann entities, including B-Team. Plaintiffs alleged that without regard for their interests, Tom hired Martin as president of B-Team. According to plaintiffs, Tom's only purpose for hiring Martin was to provide Martin leverage in other litigation pending in the chancery division (2018 chancery case[1]), relating to the Bredemann car dealerships, as Martin claimed in that case that "his employment with B-Team somehow exempts him from the withdrawal provisions in the Bredemann entity agreements." Plaintiffs alleged that in December 2019, Tom and Martin secretly and without notice to the other limited partners changed B-Team's designated office to Martin's home address and removed Joe as authorized signer.

¶ 9      Plaintiffs further alleged that Tom caused one of Travnik's policies to terminate for failing to pay premiums and that, by mid-2020, several other policies were in danger of cancelation due to Tom's failure to pay the premiums. In January 2020, Tom sent the limited partners an "Interest Adjustment and Capital Call" (January 2020 capital call), which did not acknowledge that Martin had been withdrawn from B-Team under the LPA upon the closing of the Lexus

---

[1]In a prior order from an appeal of a preliminary injunction order in the 2018 chancery case, we explained that, in 2018, the siblings' mother, Sally Bredemann, filed a complaint against Joe and John, alleging they had schemed to take control of the family businesses and force out their siblings at below market value. *In re Estate of Bredemann*, 2025 IL App (1st) 241466-U, ¶¶ 2, 5.

dealership sale and incorrectly stated that Martin had equity interest in B-Team. On April 30, 2020, Tom sent the limited partners a "B-Team Remedies Partnership Interest Adjustments & Revised Capital Call" (April 2020 capital call), requesting them to collectively contribute more than $375,000 to B-Team. According to plaintiffs, Tom's letter again did not acknowledge Martin's withdrawal from B-Team and incorrectly stated that Martin had equity interest in B-Team.

¶ 10　　In plaintiffs' claim for judicial expulsion of Tom, they alleged that he failed to manage the affairs of the partnership under section 7.1 of the LPA by failing to keep the premiums current and that he breached his duty of loyalty because his loyalty appeared to improperly run solely to Martin.

¶ 11　　As for their breach of fiduciary claim, plaintiffs alleged that Tom breached his fiduciary duties of loyalty, care, and good faith and fair dealing by, among other things, failing to pay premiums when due, issuing the capital call in April 2020, hiring Martin as president of B-Team, and failing to manage the business affairs of B-Team as required by the LPA. In plaintiffs' breach of contract claim, they alleged that Tom breached section 7.1 of the LPA by failing to manage B-Team's business affairs, which included failing to keep B-Team's life insurance policies current.

¶ 12　　In plaintiffs' prayers for relief for their breach of fiduciary duty and breach of contract claims, they requested the court remove Tom as general partner and appoint a receiver or plaintiffs' designee as general partner. In the alternative, they requested that the court dissolve B-Team pursuant to section 802 of the Uniform Limited Partnership Act (2001) (Act) (805 ILCS 215/802 (West 2020)) and order its life insurance policies be distributed to the limited partners.

¶ 13　　Plaintiffs attached the LPA to their complaint, which under the purposes section states:

　　　　"The Partnership is formed to invest and reinvest its assets with the objective of realizing capital growth and/or income, and in the event of the death of a Limited

Partner or a beneficiary of a trust which is a Limited Partner, to facilitate the transfer of the Equity Interests held by such Limited Partner to or for the benefit of the other Limited Partners."

¶ 14        Additionally, section 7.1 of the LPA states: "The business affairs of the Partnership shall be managed by the General Partner. The General Partner shall have all necessary powers to carry out the purposes of the Partnership. All such powers shall be exercised by the General Partner as a fiduciary for the benefit of the Partners."

¶ 15                                    B. B-Team's Counterclaim

¶ 16        B-Team filed a counterclaim against the limited partners, alleging that they failed to make their required contributions to the partnership following the April 2020 capital call. B-Team alleged that under the LPA, the limited partners agreed to meet capital calls if funds were required to pay the partnership's operating expenses, debt service, or working capital needs. Specifically, B-Team cited section 2.6 of the LPA, which provided that each limited partner "shall contribute to the Partnership a *pro rata* portion based on his Percentage Interest the amount of funds required by the Partnership to pay its operation expenses, debt service, or working capital needs in excess of its revenue and other available funds." Under this section, "operation expenses" included premiums on life insurance owed by B-Team.

¶ 17        B-Team further alleged that it initially generated revenue by leasing equipment to the Bredemann dealerships and that, in 2018, the dealerships stopped leasing the equipment from B-Team, resulting in revenue loss. On January 9, 2020, Tom issued a capital call for $197,665 to cover B-Team's operation expenses and debt. B-Team attached the capital call letter to its counterclaim, which explained that this amount included $57,255 in premium payments paid by

Martin since 2018 and $140,410 in annual operating expenses, consisting of the life insurance premium payments.

¶ 18    B-Team further alleged that, on April 30, 2020, pursuant to the advice of B-Team's accountant, Tom issued a revised capital call of $375,100, which included the amount set forth in the January capital call, plus an additional $171,000 in debt owed to Adelphi Enterprises, L.P., and $6,435 to reactivate one of its policies. B-Team alleged that, other than Martin's trusts, the other limited partners refused to make their required contributions and that, therefore, except for Martin's trusts, each of B-Team's limited partners breached the LPA. It requested that the court enter judgment against the trusts of Joe, John, and Mary Ann.

¶ 19                    C. Motions for Summary Judgment

¶ 20    Plaintiffs and Tom filed cross-motions for summary judgment, and B-Team filed a motion for partial summary judgment on its counterclaim. The parties attached to their motions the transcripts from the depositions of Tom, Joe, Martin, and John, which we summarize below.

¶ 21    Tom testified that when B-Team was formed, its purpose and primary business was to hold insurance policies on the lives of Joe, John, Martin, and Mary Ann's husband, Steven Travnik. The policies provided liquidity in the event of a limited partner's death and were "extremely valuable," with each policy being worth millions of dollars. As general partner, Tom was required to ensure that the premium payments were correctly and timely paid and that there was enough money available to pay the premiums. B-Team initially generated revenue by leasing equipment to the Bredemann dealerships.

¶ 22    Tom testified that from 1999 to 2017, he delegated B-Team's administrative responsibilities to Joe, during which time Joe handled B-Team's day-to-day activities, maintained B-Team's books and records, kept track of when the payments were due for the nine policies,

wrote the nine annual checks to the insurance companies, handled the lease arrangements with the dealerships, and worked with B-Team's accountant to make sure B-Team's tax returns were filed. Tom testified that the equipment leases terminated around 2016 or 2017 and that Joe "stopped all funding of B-Team" because Joe "wanted the policies to be taken out of B-Team and given to the limited partners and their beneficiaries." He further testified that in 2018, Joe wanted to both defund B-Team, as well as roll B-Team's insurance policies to the limited partners.

¶ 23    Tom testified that, sometime in 2018, he started working with Martin on B-Team's related business and was doing his "fiscal responsibility to B-Team as far as monitoring how things were going, making—the checks were being made because of a threat of Joe in January of 2018 stopping funding." In November 2019, Tom approved the decision to remove Joe's access to B-Team's bank accounts because Joe was making "erratic payments" and was not following B-Team's guidelines, as Joe was making premium payments directly to the insurance company, not through B-Team. In November 2019, Tom also hired Martin as president of B-Team, changed B-Team's registered place of business, and delegated the responsibility of maintaining its general accounts and day-to-day activities to Martin, all actions Tom believed he had authority to do as general partner.

¶ 24    Tom identified B-Team's employment agreement with Martin, which left Martin's salary blank. He testified that Martin's salary had not been determined, and B-Team's 2021 tax return listed $77,289 as unpaid compensation relating to Martin. Tom hired Martin as president of B-Team less than one week before the sale of the Bredemann Lexus dealership closed. Tom did not know that Martin would lose his job at the Lexus dealership upon the closing of that sale or that hiring Martin as B-Team's president could help Martin avoid his withdrawal from the Bredemann companies. He testified that "[a]ll I know is [Martin] wanted to work at Lexus and I

needed somebody. [Martin's] first preference was to work at Lexus or one of the dealerships," and Tom thought "the best decision would be to hire Martin because he's done a stellar job at Lexus *** So I thought the chances of him working for me were basically pretty limited." Before Tom hired Martin, B-Team did not have any employees.

¶ 25     Tom testified that, in 2019, B-Team did not have any revenue to make premium payments, and Joe and John started "engaging in self-help" by making premium payments outside of B-Team. Tom testified he never knew when Joe was going to make a payment. Tom testified that the April 30, 2020, capital call letter revised the January 2020 capital call and sought $375,000 in capital. He discussed the capital call with Martin and B-Team's accountant but did not discuss it with the other partners. Martin was the only limited partner who responded to the call and provided funds.

¶ 26     Tom further testified that, at the time of the April 2020 capital call, B-Team had seven effective life insurance policies. Two of B-Team's policies that insured Travnik had previously lapsed due to nonpayment. He agreed that B-Team lost millions of dollars in death benefits that could have affected B-Team if something happened to Travnik. One of these policies lapsed before Martin became president. When Tom received notice that the payment for the policy was behind, Tom sent an e-mail to Joe. He testified that Joe "made it very clear they weren't going to disburse any money from the family partnership and if the limited partner wasn't going to pay for it, that's what it was going to be."

¶ 27     Tom testified that he did not personally speak with Travnik and that Martin spoke to Travnik a number of times to inform him he needed to make payments on the policies or they would expire. According to Tom, Martin reported that Travnik did not want to make the payments because Travnik thought it would benefit Joe in some way. Tom testified that he did not discuss

the matter with the insurance agent or consider having Martin or B-Team make the payments that Travnik was refusing to make. Tom stated, "[W]hy would we do that as far as knowing that we might never get the money back." Tom testified that he was "in close communication with [Martin] because obviously the policies are very valuable and we didn't take these lightly as far as letting a policy lapse but [Travnik] is a grown man," and "[i]f he decides he doesn't want to pay it, we follow his decision." Asked whether he did anything to get Travnik's two policies reinstated once he learned that they had lapsed, he testified that, "I believe so and *** it got to a real point to see if we could possibly get [Travnik] to change his mind" and "we pulled out a lot of stops to see if there was any way we can keep them active."

¶ 28       Joe testified that, by late 2017, B-Team had no revenue, and the partners' capital contributions had been depleted. B-Team's equipment leases with the dealerships "were never meant to generate enough cash to pay the premiums," as they were initially intended to give B-Team a business purpose. He testified that it was "commercially reasonable to terminate" the leases because the phone equipment was beyond its depreciable life. Joe identified a letter he sent to his siblings on October 26, 2017, which stated that "[w]hile we will continue to make dealership distributions sufficient to fund taxes, none of the dealerships will be making distributions to fund any other obligations, wants or needs of the shareholders, members or partners, including B-Team." He testified that the letter also stated: "I suggest that if the full premiums for any policy are not funded by partner contributions before the premium due date, policy be distributed as directed by the insured, and that the contributions for premiums, hence no longer need to be returned."

¶ 29       Joe read a letter he and John sent to Tom on January 12, 2018, which stated:

"We are writing to demand that the Partnership agree to sell to us, or to the trusts that we designate, each of the life insurance policies which it owns on our lives, in each case for a purchase price equal to the amount of the unearned premium as of the date of the sale."

The letter also stated that, "[i]n the alternative, we demand that the Partnership distribute each of the life insurance policies to the insured party or to trusts which they designate" and that "it's imperative that these transfers be performed immediately."

¶ 30    Joe testified that in December 2019, he started making premium payments on his own to keep the policies alive, as Tom and Martin were not making the payments. Joe testified that he did not pay funds into B-Team in response to B-Team's January and April 2020 capital calls. He testified that the January 2020 capital call was inaccurate because it included Martin's trusts, even though Martin "was deemed withdrawn by that point," and it did not include B-Team's debt of $171,000 owed to the Lexus dealership. Joe requested that B-Team's accountant comment on the January 2020 capital call letter, and Joe identified the accountant's letter dated January 29, 2020, which stated that, "[a] capital call is necessary, not only for the continued operation of the partnership, but to repay those who have advanced monies for its recent operation." As for the April 2020 capital call letter, Joe agreed that this letter stated that pursuant to the accountant's recommendations, B-Team's limited partners' ownership percentages were adjusted, and the revised capital was $375,000, which covered B-Team's annual operation costs and debts. Joe believed the April 2020 capital call was incorrect because Martin's trusts were listed as partners, and Martin "was deemed withdrawn."

¶ 31    Martin testified that, in January 2018, he started helping Tom with B-Team's operations. He testified that, in a January 2018 letter, Joe demanded that B-Team agree to sell the limited partners their respective life insurance policies. Martin disagreed with rolling out the

policies and testified that "rolling out the policies would undermine the original purpose of B-Team." In August 2019, Martin learned that the Lexus dealership was going to be sold, which would result in him losing his employment there. On November 13, 2019, a few days before the sale of the Lexus dealership closed, Martin entered into an employment agreement with B-Team. According to Martin, in November 2019, B-Team's operational needs changed because the premium payments changed to quarterly payments, and there was an "effort being made to undermine [B-Team's] operation." Martin's salary as president of B-Team had not been determined. Asked what his responsibilities were for B-Team, he testified that he tried to "assemble what I could from a historical standpoint of B-Team to understand what had happened previously and set things up going forward, establishing a new bank account with *** better terms," as well as keep track of the policies and the payments, initiate the process of creating a capital call, and figure out ways B-Team could earn capital. Martin testified that two of Travnik's policies were in lapsed status before he became president.

¶ 32      John testified that he did not satisfy the January 2020 or April 2020 capital call letters. John identified the letter the accountant sent after the January 2020 capital call, which stated that "the capital call is necessary, not only for the continued operation of the partnership, but to repay advances." John testified that he did not dispute the accuracy of B-Team's debts, as stated in the April 2020 capital call, and that he did not meet that capital call contribution.

¶ 33                    D. Plaintiffs' Motion for Summary Judgment

¶ 34      In plaintiffs' motion for summary judgment filed in December 2023, they argued that, under the Act (see 805 ILCS 215/603(5) (West 2022)), Tom must be expelled as general partner because he repeatedly breached the LPA. They also contended that the court should award plaintiffs' summary judgment on their breach of contract and breach of fiduciary duty claims.

¶ 35    As for their judicial expulsion and breach of contract claims, plaintiffs stated that Tom breached the LPA and that, therefore, the court should expel him as general partner. Plaintiffs argued that, under section 7.1, Tom was required to manage the affairs of B-Team as a fiduciary for the benefit of the partners. They asserted, however, that Tom allowed Travnik's policies to lapse by failing to ensure that the premiums were paid and looked out for only Martin's interests, as he hired Martin, agreed to compensate him, and issued a capital call for which only Martin agreed.

¶ 36    Plaintiffs asserted that Tom hired Martin in violation of section 7.3 of the LPA, which prohibits limited partners from taking "part in the management of the business or affairs of the Partnership." Additionally, plaintiffs claimed that since 2018, Tom did not obtain approval from the majority of B-Team's partners for any actions he took in violation of section 11.1 of the LPA, which provides as follows:

> "Except as otherwise provided by law or in this Agreement, whenever an action is to be taken by the Partnership or whenever this Agreement refers to an action to be taken by the General Partner or the Limited Partners, such action shall be taken with the agreement of a majority in interest of the Partners, the General Partner or the Limited Partners, as the case may be."

¶ 37    Plaintiffs argued that Tom's wrongful conduct adversely affected B-Team and made it impractical to continue B-Team's activities with him as a general partner. According to plaintiffs, Tom irreparably damaged B-Team because he refused to consult with John and Joe about B-Team's business and B-Team was incapable of performing the function for which it was created.

¶ 38    Plaintiffs also contended that the undisputed facts showed that Tom repeatedly breached his fiduciary duties to Joe and John. They stated that Tom, along with Martin, cut Joe off

from performing duties related to B-Team that Joe had performed for 17 years. They asserted that a few days before the sale of the Lexus dealership, Tom entered into a secret employment agreement whereby he hired Martin as president of B-Team, a decision Joe and John did not know about until several months later when Martin "used his employment" at B-Team to support a request for a temporary restraining order in the 2018 chancery case. They stated that Tom violated his duty of care by allowing Travnik's policies to lapse without properly communicating the matter with B-Team's limited partners or advisors, and he violated his duty of loyalty by refusing to talk to Joe and John and by withholding critical business decisions from them.

¶ 39    Lastly, plaintiffs argued that B-Team should be dissolved, asserting that B-Team's partners could not get along, have sued each other in multiple forums, and were not speaking to each other. According to plaintiffs, the limited partners were not using B-Team for its intended purpose, and B-Team was unable to generate revenue to make premium payments.

¶ 40    Plaintiffs attached to their motion, among other things, the employment agreement between B-Team and Martin that was executed in November 2019. The agreement stated that Martin accepted the offer of employment if, upon termination of his employment at the Lexus dealership, a position of "full-time senior management level employee" at one of the Bredemann dealerships was not "made available to him."

¶ 41    Plaintiffs also attached to their motion Martin's intervenor motion filed in the 2018 chancery case. In that motion, Martin, along with his mother Sally Bredemann, asserted that when the assets of the Lexus dealership were sold in November 2019, Joe and John fired Martin from his position at the Lexus dealership and took the position that Martin and his trusts were involuntarily withdrawn from the family businesses because he did not have a "senior management position" with one of the Bredemann companies. In that motion, Martin further asserted that he

was currently employed in full-time senior management positions because he was president of B-Team and the senior executive of his Martin trusts.

¶ 42                    E. Tom's Motion for Summary Judgment

¶ 43      In Tom's motion for summary judgment, he contended that plaintiffs could not establish their claims for judicial expulsion, breach of fiduciary duty, or breach of contract. He highlighted that plaintiffs did not want B-Team to continue and deliberately created B-Team's failure to make the policy premium payments. According to Tom, Joe and John terminated B-Team's regular source of revenue in 2017, which resulted in B-Team being consistently short on capital.

¶ 44      Citing a January 2018 letter from Joe to B-Team, Tom asserted that plaintiffs demanded that Tom roll out B-Team's insurance policies to them. Tom argued that rolling out the policies to the insureds was "fatally flawed" and would have a "seriously deleterious effect on everyone's individual estate plans." He stated it would destroy B-Team's purpose of holding the policies, as the "family of a deceased owner would receive the insurance proceeds and the Bredemann companies would still be obligated to come up with the money to redeem the deceased owners' interest." To support these assertions, Tom attached corporate attorney Steve Katz's testimony from a March 9, 2023, hearing in the 2018 chancery case.

¶ 45      Tom stated that, by late 2019, B-Team was not generating any revenue, and the dealerships would not advance B-Team any funds, causing Tom to issue a capital call in April 2020, which plaintiffs did not meet. Tom cited Joe's testimony from the 2018 chancery case on October 24, 2022, in which Joe agreed with counsel's questions that "at some point in time you decided that you did not want B[-]Team to continue, correct?" and "so you *** as a general partner of Lexus, decided that you would no longer advance any funds to B[-]Team, correct."

¶ 46    Tom argued that plaintiffs could not establish that his decision to hire Martin breached his fiduciary duties, as he had the authority to make employment decisions under section 7.1 of the LPA, his decision was based on reasonable needs and circumstances, and he did not deliberately fail to manage B-Team. Tom noted that all the insurance policies were in effect except for one, which could be reinstated. Tom argued that the evidence showed he provided the limited partners with annual financial reports as required by the LPA and that the business judgment rule protected his business decisions, which he performed in good faith with the intention to protect B-Team's long-term purpose.

¶ 47                    F. B-Team's Motion for Partial Summary Judgment

¶ 48    In B-Team's motion for partial summary judgment on its breach of contract counterclaim, it argued that it was undisputed that the LPA required capital contributions to pay the insurance premiums and that plaintiffs failed to comply with their contractual obligations following the April 30, 2020, capital call. They asserted that because no genuine issue of fact existed as to the limited partners' liability or the amount they owed in required capital and interest, the court should enter partial summary judgment against plaintiffs on B-Team's counterclaim.

¶ 49                            G. Capital Call Letters

¶ 50    B-Team and Tom attached to their motions for summary judgment the January 9, 2020, capital call letter; B-Team's accountant's January 29, 2020, letter; and the April 30, 2020, capital call letter. The January 9, 2020, capital call letter sent by Tom to the limited partners stated that, pursuant to section 2.6 of the LPA, B-Team was instituting a capital call to cover B-Team's operation expenses and debt in the amount of $197,665, which included B-Team's annual premium payments of $140,410, and $57,255 owed to Martin for premium payments he made to prevent the policies from lapsing.

¶ 51 The January 29, 2020, letter sent from B-Team's accountant, John Keating, to Tom provided that some of the limited partners had asked him to comment on his January 9, 2020, letter. The letter further stated that, "[t]he capital call is necessary not only for the continued operation of the partnership, but to repay those who have advanced monies for its recent operation." The letter stated that B-Team correctly owed Martin $57,255 and that it also owed Adelphi Enterprises a total of $171,000 that it had previously advanced to B-Team. The debts were incurred before the sale of the Lexus dealership.

¶ 52 The April 30, 2020, capital call letter sent by Tom to the limited partners stated that B-Team's accountant provided an updated calculation of B-Team's ownership percentages and outstanding debt and that, "[p]er [the accountant's] recommendations, I have adjusted the limited partner ownership percentages." The letter stated that B-Team was instituting a revised capital call for $375,100, which included $140,410 in annual premium payments on active life insurance policies, $6,435 to reactive a life insurance policy related to Travnik, and $228,255 in existing debts, which included $171,000 owed to Adelphi Enterprises and $57,255 owed to Martin.

¶ 53 H. Circuit Court's April 25, 2024, Order

¶ 54 In a written order on April 25, 2024, the circuit court denied plaintiffs' motion for summary judgment on all bases, except for their request for judicial dissolution. The court granted Tom's motion for summary judgment on all bases, except for his objection to B-Team's judicial dissolution. In doing so, the court concluded that all of Tom's actions for which plaintiffs complained were within the authority given to him under section 7.1 of the LPA, as he was carrying out B-Team's business affairs and he did not need approval from the other limited partners to take such actions.

¶ 55    As for B-Team's breach of contract counterclaim, the court granted B-Team's motion for partial summary judgment and entered judgment in B-Team's favor, concluding that the third-party defendants breached the LPA by failing to respond to the capital call.

¶ 56    The court also ordered B-Team's dissolution under the Act (see 805 ILCS 215/802 (West 2024)), concluding that the "hostility towards each other and the lack of funding for [B-Team] are both sufficient to warrant the judicial dissolution." The court continued the matter for calculation of damages and B-Team's dissolution and winding-up.

¶ 57                    I. Motions Following April 25, 2024, Order

¶ 58    Plaintiffs moved to reconsider the court's April 25, 2024, order granting B-Team's motion for partial summary judgment on B-Team's counterclaim. They argued, among other things, that there was a fact question as to whether plaintiffs breached the LPA by failing to provide funds in response to the April 2020 capital call, as the facts showed that the accuracy of the capital call was in dispute. To support their argument, plaintiffs asserted that Joe testified in his deposition that the inclusion of Martin's trusts as partners in the capital calls was a "fatal mistake in the calculation." They also attached a February 28, 2020, letter that the Bredemann Companies' litigation counsel sent to the attorneys for Martin and Mary Ann, which stated that, after the November 18, 2019, closing on the sale of the Lexus dealership, Martin "ceased to be employed in a full-time senior management position" with any of the Bredemann companies, resulting in the Martin trusts' withdrawals from the Bredemann Companies. Plaintiffs argued that the letter showed that the "Martin trusts were deemed to have withdrawn from the Bredemann Companies by virtue of the sale of Bredemann Lexus."

¶ 59    As for B-Team, it filed a motion to reconsider the court's ruling regarding judicial dissolution, as well as a motion requesting the court assess interest and attorney fees and enter

judgment on its counterclaim. B-Team argued that, following the court's grant of summary judgment on its counterclaim, it is entitled to interest and costs of collection under the LPA and the court should enter judgment against plaintiffs in the amount set forth in its motion.

¶ 60                              J. Circuit Court's July 30, 2024, Order

¶ 61    On July 30, 2024, in a written order, the court denied plaintiffs' motion to reconsider its order granting summary judgment in favor of B-Team on its counterclaim. It also denied B-Team's motion to reconsider the judicial dissolution ruling.

¶ 62    However, as for B-Team's motion requesting the court to assess interest and attorney fees and enter judgment on its counterclaim, the court granted in part and stayed in part that motion. The court found that B-Team reasonably incurred $72,828.29 as "costs of collection" under the LPA. However, the court stayed its ruling on damages, which included the final allocation of attorney fees and costs, until further order regarding B-Team's dissolution and winding up. The court directed the parties to submit memorandum on B-Team's dissolution and winding-up process.

¶ 63                  K. Third-Party Defendants' "Brief Addressing Jurisdiction"

¶ 64    Thereafter, in November 2024, third-party defendants, which are Martin's three trusts and Mary Ann's three trusts, filed a "brief addressing jurisdiction," arguing that the court did not have jurisdiction to enter the order directing the judicial dissolution of B-Team because six of the limited partners, which included Martin's and Mary Ann's trusts, were not parties to the suit at the time the court entered the order. They argued that all limited partners were necessary parties to judicially dissolve a limited partnership.

¶ 65                    L. Circuit Court's December 16, 2024, Order

¶ 66        On December 16, 2024, the court entered a written order granting third-party defendants' motion challenging the court's jurisdiction to dissolve B-Team and vacating the portion of the court's April 25, 2024, order judicially dissolving B-Team. In doing so, the court stated that plaintiffs included judicial dissolution as an alternative remedy in their prayer for relief and not as an independent claim for judicial dissolution in their complaint. The court concluded that "it was error for this Court to grant the alternative relief of judicial dissolution, when Plaintiffs were unsuccessful of their substantive claims." The court also denied plaintiffs' oral motion to file an amended complaint to add an independent count for judicial dissolution. The court stated, however, that "[n]othing in this [o]rder serves as a bar to Plaintiffs filing an independent cause of action for judicial dissolution of [B-Team]."

¶ 67                    M. Motions Following December 16, 2024, Order

¶ 68        Plaintiffs moved to reconsider the court's December 16, 2024, order, asserting that during oral argument on third-party defendants' challenge to jurisdiction, third-party defendants presented an entirely new argument, including that, for judicial dissolution to be proper, plaintiffs must either plead judicial dissolution as a separate claim or they must prevail on a claim that requested judicial dissolution as a remedy. Plaintiffs argued that even if there were such a requirement for judicial dissolution, the court should have allowed plaintiffs to amend their complaint. We note that the transcript from December 16, 2024, hearing is not included in the record.

¶ 69        As for B-Team, it filed a motion to modify the court's December 16, 2024, order, asserting that, in that order, the court entered judgment in its favor on its counterclaim and that, therefore, the court should now fix the judgment amounts against plaintiffs in the amount set forth

in its motion. B-Team requested the court enter judgment against John's and Joe's trusts, and it set forth the total amount owed by each plaintiff trust, which included the original amount of the capital call, contractual interest at 14%, and costs of collection.

¶ 70    In plaintiffs' response to B-Team's motion, they asserted that B-Team did not suffer any damages, given that plaintiffs' conduct saved B-Team money, as Joe and John paid far more in insurance premiums to keep the policies active than they would have paid if they had not engaged in self-help. They argued that because B-Team was not entitled to recover damages on its breach of contract counterclaim, then B-Team was not entitled to recover interest or costs of collection, as B-Team did not suffer a financial loss. Plaintiffs attached affidavits from Joe and John, in which they averred how much they personally paid since July 2020 in premium payments for their respective policies for the benefit of B-Team.

¶ 71    In January 2025, plaintiffs filed a motion requesting the court reconsider its April 25, 2024, order granting defendants' summary judgment on plaintiffs' claims.

¶ 72                    N. Circuit Court's January 27, 2025, Order

¶ 73    In a written order on January 27, 2025, the court denied plaintiffs' motion to reconsider the court's April 25, 2024, order granting summary judgment in favor of defendants, and it clarified that order to add as follows: "Given Tom's authority to act under the Limited Partnership Agreement measured against the actions and/or inactions complained of, there is no genuine issue of material fact to the motion."

¶ 74    In a separate written order entered that same day, the court denied plaintiffs' motion to reconsider the court's December 16, 2024, order vacating its dissolution ruling. In doing so, the court stated that it was "unwilling to exercise its discretion" to dissolve B-Team because plaintiffs' complaint did not include a standalone claim for dissolution and plaintiffs only included

dissolution as an alternative remedy in their prayer for relief in claims on which they did not prevail. The court also reasoned that it would be prejudicial to grant judicial dissolution when plaintiffs raised it "as part of summary judgment motions after the close of fact discovery and while there is a question as to whether the other limited partners should have been named as parties" and the "unnamed limited partners are asserting that their input on factors to determine dissolution was not heard and that [B-Team] should continue as a going concern."

¶ 75        The court also denied plaintiffs' request for leave to amend their complaint "due to the late stage of the request." It stated that allowing plaintiffs leave to amend would prejudice the opposing litigants and that its ruling did not prevent plaintiffs from bringing another action that included a standalone claim for dissolution.

¶ 76                                O. April 2, 2025, Order

¶ 77        After a hearing on April 2, 2025, the court issued a written order, in which it granted in part and denied in part B-Team's motion, stating that, to the extent the motion sought "monetary damages" on its counterclaim, "it is denied as neither sufficiently proven nor properly before the Court." The court concluded, however, that, to the extent B-Team's motion sought to enforce the capital call requirements under the LPA, each limited partner trust must "make the required capital call payments sought in the April, 2020 revised capital call letter." The court also ordered the limited partners to pay interest at the contractual rate of 14% and $72,828.29 in costs of collection, which the court had previously determined in its July 30, 2024, order. The court set forth the capital call amount, interest, and costs of collection owed by each of the 11 limited partner trusts.

¶ 78        This appeal followed.

¶ 79                                    II. ANALYSIS

¶ 80        On appeal, plaintiffs argue that the circuit court erred by vacating its initial April 2024 order directing the judicial dissolution of B-Team. They also argue the court erred in granting summary judgment in favor of defendants on plaintiffs' claims and in granting summary judgment in favor of B-team on its counterclaim.

¶ 81                                  A. Judicial Dissolution

¶ 82        We first address plaintiffs' argument that the court erred in its December 16, 2024, order that vacated the portion of its April 25, 2024, order directing B-Team's judicial dissolution. Plaintiffs assert that, contrary to the circuit court's order, there is no language in the Act that requires an "application" for judicial dissolution be made in a standalone claim or that the applicant must prevail on a claim seeking judicial dissolution as a remedy. According to plaintiffs, they properly made an application for judicial dissolution by requesting it in their complaint and in their motion for summary judgment.

¶ 83        The judicial dissolution section of the Act states: "On application by a partner the circuit court may order dissolution of a limited partnership if it is not reasonably practicable to carry on the activities of the limited partnership in conformity with the partnership agreement." 805 ILCS 215/802 (West 2024). Plaintiffs correctly state that "application" is defined as "[a] request or petition." Black's Law Dictionary (12th ed. 2024).

¶ 84        Plaintiffs assert that the circuit court's interpretation of the Act is a question of law, subject to *de novo* review, in that it requires a limited partner to file a standalone claim for judicial dissolution or be the prevailing party on a claim seeking judicial dissolution. See *In re Marriage of Chee*, 2011 IL App (1st) 102797, ¶ 7 ("Statutory interpretation is a question of law and we address questions of law *de novo* on appeal."). Defendants respond that we should review the

circuit court's judicial dissolution decision for abuse of discretion. Under either standard, we find the court did not err.

¶ 85    Here, plaintiffs' request for judicial dissolution was set forth in plaintiffs' complaint as an alternative remedy in their prayers for relief for their breach of fiduciary duty and breach of contract claims against Tom and B-Team, claims on which they did not prevail. Plaintiffs did not allege any claim for judicial dissolution or any facts to support such a claim in their complaint. Additionally, the other limited partners, including Mary Ann's and Martin's trusts, were not named as parties in their complaint that requested judicial dissolution as an alternative form of relief. The fact that these parties may have been aware of this lawsuit, as plaintiffs argue, is not sufficient where they were never named as parties to plaintiffs' complaint or served. As such, where not all of B-Team's limited partners were parties in plaintiffs' complaint that requested judicial dissolution as an alternative remedy, the court was correct when it did not grant the relief of judicial dissolution.

¶ 86    Plaintiffs rely on *Tembrina v. Simos*, 208 Ill. App. 3d 652 (1991), and *Dowell v. Bitner*, 273 Ill. App. 3d 681 (1995), to support their argument that the court erred in vacating its original order granting plaintiffs' request for judicial dissolution. We find these cases distinguishable.

¶ 87    In *Tembrina*, the plaintiff's complaint for accounting and reconveyance of the property to the trust sought any other relief the court deemed equitable, and the plaintiff later filed a motion seeking dissolution of the partnership. 208 Ill. App. 3d at 654-55, 657. The court concluded that "[t]he fact that a partner's accounting action does not contain a specific request for a dissolution will not preclude a court from ordering that a partnership be dissolved." *Id.* at 657. However, when the plaintiff filed the motion seeking dissolution of the partnership, the other two partners were defendants in the plaintiff's complaint. *Id.* at 654-55. Unlike *Tembrina*, Mary Ann's and Martin's

trusts were not named as parties in plaintiffs' complaint that sought judicial dissolution as an alternative remedy in their claims for breach of fiduciary duty and breach of contract against Tom and B-Team. They were also not named as parties in plaintiffs' complaint when plaintiffs asserted their request for judicial dissolution in their motion for summary judgment.

¶ 88    In *Dowell*, unlike here, the plaintiff and the defendant's partnership agreement allowed either partner to terminate the partnership by giving 30 days of written notice to the other partner. *Dowell*, 273 Ill. App. 3d at 684. The defendant delivered a signed termination notice to the plaintiff on March 17, 1989, and the trial court concluded that the partnership terminated on that date. *Id.* at 684-85. The trial court found that the defendant did not breach his fiduciary duty, approved the partnership's accounting, and found that the partnership's winding up was fair and reasonable. *Id.* at 688, 692. On appeal, the parties disputed the date on which the partnership dissolved, which was the date the defendant's fiduciary duty ended to the plaintiff. *Id.* at 690-91. The appellate court concluded that the trial court "properly determined the partnership was dissolved on March 17, 1989," when the defendant expressed his intent to cease his association with the partnership by giving notice to the plaintiff. *Id.* at 691. *Dowell* is distinguishable from the facts here, and we are not persuaded by plaintiffs' reliance on it.

¶ 89    Plaintiffs next argue that the circuit court erred in denying their request to amend their complaint to allege a standalone claim for judicial dissolution.

¶ 90    Section 2-616(a) of the Code of Civil Procedure (Code) (735 ILCS 5/2-616(a) (West 2024)) provides that "[a]t any time before final judgment amendments may be allowed on just and reasonable terms." Under section 2-616(c) of the Code, "[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." *Id.* § 2-616(c). However, "plaintiffs do not have an absolute and

unlimited right to amend." *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 6 (2004).

¶ 91    We review a circuit court's ruling on a plaintiff's motion to amend pleadings under the abuse of discretion standard. *Geisler v. Everest National Insurance Co.*, 2012 IL App (1st) 103834, ¶ 94. The circuit court is considered to have abused its discretion if its ruling "is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23.

¶ 92    To determine whether leave to amend a complaint should be granted, courts review a number of factors. *Tomm's Redemption, Inc. v. Hamer*, 2014 IL App (1st) 131005, ¶ 13. These factors include whether "(1) the amendment cures a defect in the pleadings, (2) the other party is prejudiced or surprised by the proposed amendment, (3) the proposed amendment is timely, and (4) there were previous opportunities to amend the pleadings." *Asher Farm Ltd. Partnership v. Wolsfeld*, 2022 IL App (2d) 220072, ¶ 46.

¶ 93    "[T]hese factors do not apply to postjudgment requests to amend." *Id.* ¶ 47. "After final judgment, a plaintiff has no statutory right to amend a complaint and a court commits no error by denying a motion for leave to amend." *Tomm's Redemption, Inc.*, 2014 IL App (1st) 131005, ¶ 14. After the court enters judgment, a party "can amend only to conform the pleadings to the proofs" but "cannot amend his or her complaint to add new claims or theories or to correct other deficiencies." *Asher Farm Ltd. Partnership*, 2022 IL App (2d) 220072, ¶ 47 (citing *Tomm's Redemption, Inc.*, 2014 IL App (1st) 131005, ¶ 14, citing 735 ILCS 5/2-616(c) (2010)).

¶ 94    In the court's December 16, 2024, written order, it denied plaintiffs' oral motion to amend their complaint to add an independent cause of action for judicial dissolution. The court's written order did not provide the reasons for its denial, and we do not have a transcript of the

hearing at which the court denied plaintiffs' oral motion to amend their complaint. Plaintiffs, as appellants, have

> "the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

Because we do not have a complete record, we cannot review the arguments the parties made at the hearing or the court's reasons for denying plaintiffs' oral motion at that hearing. We therefore cannot determine whether the court abused its discretion, and we presume the court's order had a sufficient legal and factual basis. See *Illinois Founders Insurance Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 56 (where there was no report of proceedings of the trial court's hearing, the court cannot "divine the trial court's reasoning in denying defendant's motion" nor "determine whether that decision constituted an abuse of discretion"); *Foutch*, 99 Ill. 2d at 392 ("As there is no transcript of the hearing on the motion to vacate here, there is no basis for holding that the trial court abused discretion in denying the motion.").

¶ 95 Nevertheless, we do have the court's written order denying plaintiffs' motion to reconsider the December 16, 2024, order, which provided certain reasons for its denial of plaintiffs' motion to amend. In that order, the court stated it further denied plaintiffs' request for leave to amend "due to the late stage of the request" and the prejudice to the opposing litigants.

¶ 96 Plaintiffs sought leave to amend only after judgment to add a new claim and/or new parties, and the court correctly rejected it. Even if we applied the factors stated above, we cannot find the court abused its discretion in denying plaintiffs' leave to amend. As for whether a proposed amendment would cure the defective pleading, the record does not include a proposed amended

pleading with a new claim for judicial dissolution, and plaintiffs did not attach such proposed pleading to their motion to reconsider the court's order denying their motion to amend. Plaintiffs have forfeited their argument by not submitting a proposed amended complaint. See *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 521-22 (1987). As for prejudice, we agree with the circuit court that permitting plaintiffs leave to amend would prejudice the opposing litigants where (1) they were not parties in plaintiffs' complaint that sought the relief of judicial dissolution as an alternative remedy for their claims alleged against Tom, (2) discovery was closed, and (3) summary judgment had been entered in favor of defendants. Additionally, the court highlighted that plaintiffs were not prejudiced by its ruling, as they could bring another action that included a standalone claim for judicial dissolution. In fact, the parties state in their briefs that plaintiffs have already filed a new action in the circuit court seeking dissolution of B-Team. As for the timeliness of the proposed amendment and whether plaintiffs had prior opportunities to amend, plaintiffs made their request to amend at the first opportunity they had, as they made their oral request at the same hearing the court reconsidered its previous ruling that granted their request for judicial dissolution. However, after reviewing the factors as a whole and considering the discretion we must afford to the circuit court, we cannot find that the court's ruling denying plaintiffs' request to amend was arbitrary or fanciful or that no reasonable person would take the view adopted by the court.

¶ 97      B. Summary Judgment in Favor of Defendants on Plaintiffs' Claims

¶ 98      Next, plaintiffs argue that the court erred when it granted summary judgment in favor of defendants on plaintiffs' claim to judicially expel Tom as well as on their claims for breach of fiduciary duty and breach of contract. Plaintiffs assert that they identified multiple genuine fact issues on their claims that precluded summary judgment.

¶ 99 "Summary judgment is a drastic means of disposing of litigation and should be entered only when the right of the moving party is clear and free from doubt." *Lopez-Arana v. Brian Properties, Inc.*, 2024 IL App (1st) 231652, ¶ 17. "A defendant moving for summary judgment bears the initial burden of proof." *Erie Insurance Exchange v. Compeve Corp.*, 2015 IL App (1st) 142508, ¶ 15. A defendant may meet the initial burden of proof "by either affirmatively showing that some element of the case must be resolved in defendant's favor or by showing the absence of evidence supporting the plaintiff's position on one or more elements of the cause of action." *Lopez-Arana*, 2024 IL App (1st) 231652, ¶ 17. "In other words, there is no evidence to support the plaintiff's complaint." *Erie Insurance Exchange*, 2015 IL App (1st) 142508, ¶ 15. "The plaintiff is not required to prove her case at the summary judgment stage; in order to survive a motion for summary judgment, she must present a factual basis that would arguably entitle her to a judgment." *Lopez-Arana*, 2024 IL App (1st) 231652, ¶ 17.

¶ 100 Further, where the parties file cross-motions for summary judgment, as here, "they concede[ ] that no material questions of fact existed and that only a question of law existed that the court could decide based on the record." *Owen v. Village of Maywood*, 2023 IL App (1st) 220350, ¶ 17. "However, the mere filing of cross-motions for summary judgment does not conclusively establish that there is no issue of material fact, nor is the circuit court obligated to enter summary judgment for either party." *Id.* A circuit court may properly grant summary judgment if the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2024). When reviewing a motion for summary judgment, the court must construe these documents "strictly against the moving party and liberally in favor of the nonmovant." *Outboard Marine Corp. v. Liberty Mutual Insurance*

*Co.*, 154 Ill. 2d 90, 131-32 (1992). Our review of the circuit court's entry of summary judgment is *de novo*. *Lopez-Arana*, 2024 IL App (1st) 231652, ¶ 18.

¶ 101    Here, the circuit court granted summary judgment in favor of defendants on plaintiffs' claims for breach of fiduciary duty and breach of contract, as well as on their claim to judicially expel Tom as general partner.

¶ 102    We first address plaintiffs' breach of fiduciary duty claim. "To prevail on a claim for breach of fiduciary duty, plaintiffs must allege and ultimately prove (1) the existence of a fiduciary duty, (2) breach of the fiduciary duty, and (3) that such breach proximately caused the injury of which the party complains." *Wolfson v. Dugout Northbrook, LLC*, 2025 IL App (1st) 232257, ¶ 70.

¶ 103    Under the Act, the partnership agreement, "governs relations among the partners and between the partners and the partnership." 805 ILCS 215/110(a) (West 2024). Further, "[a] partnership is a contractual relationship, and as such, contract law applies and a partnership is accordingly controlled by the terms of the agreement under which it is formed." *Pielet v. Hiffman*, 407 Ill. App. 3d 788, 795 (2011). Here, under the LPA, B-Team was a limited partnership, with a general partner and limited partners. For the management rights for a general partner in a limited partnership, the Act provides, "[e]xcept as expressly provided in this Act, any matter relating to the activities of the limited partnership may be exclusively decided by the general partner or, if there is more than one general partner, by a majority of the general partners." 805 ILCS 215/406(a) (West 2024). Under the LPA, section 7.1 provides that the "business affairs of the Partnership shall be managed by the General Partner" and the general partner "shall have all necessary powers to carry out the purposes of the Partnership."

¶ 104    Further, under the Act, a general partner owes fiduciary duties of loyalty and care to the limited partnership and the other partners. *Id.* § 408(a). As for the duty of loyalty, under the Act, the general partner must, as relevant here,

> "account to the limited partnership and hold as trustee for it any property, profit, or benefit derived by the general partner in the conduct *** of the limited partnership's activities or derived from a use by the general partner of limited partnership property, including the appropriation of a limited partnership opportunity." *Id.* § 408(b)(1).

¶ 105    As for the duty of care, "[a] general partner's duty of care to the limited partnership and the other partners in the conduct and winding up of the limited partnership's activities is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." *Id.* § 408(c). The general partner must also "exercise any rights consistently with the obligation of good faith and fair dealing." *Id.* § 408(d).

¶ 106    "Under Illinois law, a general partner will not be deemed in breach of his fiduciary duties where he has complied with an express authorization in the partnership agreement." *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1062 (2001). However, while a partnership agreement may "identify specific types or categories of activities that do not violate the duties, if not manifestly unreasonable," it may not "eliminate or reduce fiduciary duties." 805 ILCS 215/110(b)(5)(A) (West 2024). This court has stated that the "existence of a fiduciary relationship between all partners is well established, and each partner is bound to exercise the utmost good faith and honesty in all matters relating to the partnership business." *Pielet*, 407 Ill. App. 3d at 795. Further, the fiduciary duty of a partner—which encompasses the duty of good faith, honesty, and fairness in dealings with the limited partners and the funds of the partnership—"exists concurrently with the obligations set forth in the partnership agreement whether or not expressed therein."

*Labovitz v. Dolan*, 189 Ill. App. 3d 403, 412 (1989). Here, section 7.2 of the LPA provides that the general partner "shall not be liable, responsible or accountable in damages or otherwise to the Partnership or to any of the Partners for any acts performed or omitted to be performed in good faith."

¶ 107    Plaintiffs argue that the evidence shows that Tom mismanaged B-Team's affairs in violation of his duty of care to the other partners. They assert that it is undisputed that Tom secretly hired Martin and cut off Joe's access to B-Team's bank account and that they should be given the opportunity to argue to a fact finder that these actions violated Tom's fiduciary duties, as well as his obligation under the LPA to properly manage the business affairs of B-Team.

¶ 108    Under section 7.1 of the LPA, Tom had broad authority to manage B-Team's business affairs and had "all necessary powers to carry out the purposes of the Partnership." The evidence shows that B-Team's primary purpose was to hold the insurance policies and that, after the equipment leases with the dealerships terminated and the dealerships stopped distributing funds to B-Team, B-Team did not have any revenue to pay the insurance premiums. In November 2019, Tom hired Martin as president of B-Team and delegated the responsibility of maintaining B-Team's accounts to him, in an effort to protect the policies B-Team held, as he testified he believed hiring Martin was a business decision and would protect B-Team and the insurance policies it held. Accordingly, because Tom had broad authority under the LPA to manage the business affairs and the necessary powers to carry out B-Team's purpose, he had authority to hire Martin as president of B-Team and, consequently, to remove Joe's access to the bank account, and he complied with the LPA.

¶ 109    Further, plaintiffs have not presented sufficient evidence to show that Tom's decision to hire Martin as president was made in bad faith or that it violated his fiduciary duties of care or

loyalty to the limited partners. Plaintiffs assert that Tom's hiring of Martin "paved the way for Martin to argue in the 2018 Litigation that Martin should not be deemed withdrawn from the Bredemann Companies." However, the evidence shows that Tom did not know that Martin's role as president of B-Team could impact the 2018 chancery case relating to Martin's withdrawal from the Bredemann companies, as Tom testified that he did not know that Martin would lose his job at the Lexus dealership upon the closing of that sale, or that hiring Martin as B-Team's president could help Martin avoid his withdrawal from the Bredemann companies. Plaintiffs also assert that there was a question of fact as to whether Tom's decision to pay Martin constituted a waste of resources, given that B-Team did not have a current source of revenue. However, the record shows that Martin's salary had not been determined and that B-Team reported unpaid compensation owed to Martin on its tax return in 2021.

¶ 110    Plaintiffs next argue that Tom violated his duty of care and failed to properly manage B-Team's business affairs because he allowed two of B-Team's insurance policies to lapse—one on September 1, 2019, and the other on November 9, 2019. The record shows that before Travnik's policies lapsed in 2019, B-Team no longer had any revenue from the equipment leases with the dealerships to pay the premium payments on its insurance policies, as Joe had terminated the leases and the dealerships had stopped distributing funds to B-Team. The record also shows that, in November 2019, Tom hired Martin to "protect the insurance policies" and that, shortly thereafter, Tom issued the capital calls in 2020 to generate funds for B-Team. B-Team's accountant stated in his January 2020 letter that "[t]he capital call is necessary not only for the continued operation of the partnership, but to repay those who have advanced monies for its recent operation." Accordingly, the record shows that Tom took reasonable steps to continue B-Team's operations and purpose. We cannot find that the fact that two of B-Team's insurance policies lapsed in 2019

sufficiently supports a claim that Tom breached his fiduciary duty of care to B-Team and its limited partners.

¶ 111    Plaintiffs also argue that Tom breached his duty of loyalty because he failed to communicate with Joe and John about B-Team's affairs. They assert that Tom only shared information with Martin and that Tom and Martin secretly plotted to change B-Team's registered address, cut off Joe's access to the bank account, and hire Martin as president.

¶ 112    The Act does not provide that, as general partner of the limited partnership, Tom's duty of loyalty required him to seek approval from the limited partners on his decisions relating to managing B-Team's business affairs. See 805 ILCS 215/408(b) (West 2024). Further, as previously discussed, under section 7.1 of the LPA, Tom, as general partner, had broad authority to manage B-Team's business affairs and the necessary powers to carry out B-Team's purpose, which included the decision to hire Martin as president, to delegate the responsibility of maintaining its general accounts to Martin, and, consequently, to remove Joe from the bank account and to change the registered office. We cannot find that plaintiffs presented sufficient evidence to support a claim that Tom breached his duties of loyalty or honesty based on the argument that he failed to communicate with Joe and John about his business decisions, as general partner, to hire Martin, remove Joe from the bank account, or change the registered office.

¶ 113    Plaintiffs next assert that Tom's selective prosecution of Joe and John creates a fact question regarding whether he breached his fiduciary duties. They assert that B-Team only sued Joe and John for breach of contract, even though none of the limited partners fully responded to the April 30, 2020, capital call.

¶ 114    The record shows that B-Team filed its counterclaim against the trustees of all the limited partner trusts that were limited partners in November 2019 and the caption of B-Team's

counterclaim includes all 11 limited partner trusts. In B-Team's counterclaim, it alleged that Martin's trusts satisfied their obligations in response to the capital calls, but the other limited partners—including the trusts of Joe, John, and Mary Ann—did not pay anything such that each of the limited partners, other than the Martin trusts, were in breach of the LPA. B-Team also stated that, although B-Team did not allege the Martin trusts breached the LPA, the Martin trusts were "included as third-party defendants as interested—if not necessary—parties to this partnership dispute." Accordingly, B-Team's counterclaim was against the limited partners who failed to pay the capital call, and B-Team's counterclaim did not selectively prosecute Joe and John.

¶ 115                              C. Breach of Contract

¶ 116        Plaintiffs argue that the circuit court erred in granting summary judgment in favor of defendants on plaintiffs' breach of contract claim. As previously noted, "[a] partnership is a contractual relationship, and as such, contract law applies and a partnership is accordingly controlled by the terms of the agreement under which it is formed." *Pielet*, 407 Ill. App. 3d at 795. "If the written agreement is unambiguous, the court must construe the parties' intent from the writing itself as a matter of law and effectuate its plain and ordinary meaning." *Id.*

¶ 117        Plaintiffs assert that they presented sufficient evidence to permit a fact finder to conclude that Tom breached section 7.1 of the LPA, which requires the general partner to exercise all powers "as a fiduciary for the benefit of the Partners." Plaintiffs state that the record shows that Tom mismanaged B-Team's affairs and took action that benefited Martin to the detriment of Joe and John. According to plaintiffs, Tom's failure to generate revenue and his conduct in allowing two insurance policies to lapse raises a fact question as to whether he breached section 7.1.

¶ 118        However, as previously discussed, Tom had broad authority, under section 7.1, to manage B-Team's business affairs, as the "business affairs of the Partnership shall be managed by

the General Partner" and the general partner shall have all necessary powers to carry out the purposes of the Partnership." Under this authority, Tom hired Martin as president and issued capital calls to generate funds to pay the insurance premiums in an effort to continue B-Team's operations. We previously found that the evidence was insufficient to support a claim that Tom breached his fiduciary duties, and we likewise conclude that there was insufficient evidence to support a claim that Tom breached section 7.1 of the LPA.

¶ 119    Plaintiffs also claim that the evidence showed that Tom violated section 7.3 of the LPA, which states: "No person in such person's capacity as a Limited Partner shall take part in the management of the business or affairs of the Partnership or have the right or authority to act for or bind the Partnership." According to plaintiffs, a fact issue exists as to whether Tom violated this provision because he "secretly" hired Martin as B-Team's president.

¶ 120    However, as general partner of the limited partnership, Tom had authority to hire Martin under section 7.1 of the LPA, and he did not need approval from the limited partners. Tom's decision to hire Martin also did not violate section 7.3, as Martin was not a limited partner of B-Team. The limited partners of B-Team are the trusts of Joe, John, Martin, and Mary Ann.

¶ 121    Plaintiffs next assert that they raised genuine issues of material fact regarding whether Tom's refusal to communicate, consult with, or get approval from the limited partners breached section 11.1 of the LPA. They assert that there is no language in the LPA that gave Tom unilateral right to hire employees and issue capital calls.

¶ 122    As previously discussed, under section 7.1 of the LPA, Tom, as general partner, had authority to hire Martin and issue capital calls.

¶ 123    Section 11.1 addresses when an action is to be taken by the partnership, the general partner, or the limited partners. Section 11.1 states as follows:

"Except as otherwise provided by law or in this Agreement, whenever an action is to be taken by the Partnership or whenever this Agreement refers to an action to be taken by the General Partner or the Limited Partners, such action shall be taken with the agreement of a majority in interest of the Partners, the General Partner or the Limited Partners, as the case may be."

¶ 124    The plain language of section 11.1 does not provide that Tom, as general partner, needed agreement from the majority interest of the limited partners when he took action as the general partner under the LPA. Rather, when a general partner takes action under the LPA, the action shall be taken with the agreement of a majority interest of the general partner. As for actions taken by the limited partners under the LPA, in sections 6.1 and 11.2, the consent of the limited partners is required for, respectively, dissolution and amending the LPA, which are actions that do not apply here. As such, the evidence was insufficient to support a claim that Tom violated section 11.1 of the LPA when he hired Martin as president of B-Team and issued the capital calls.

¶ 125                    D. Judicial Expulsion of General Partner

¶ 126    Plaintiffs contend that they presented sufficient evidence to permit a reasonable fact finder to conclude that Tom should be expelled as B-Team's general partner.

¶ 127    Under the Act, "on application by the limited partnership," a court may order judicial expulsion of a general partner if it determines:

"(A) the person engaged in wrongful conduct that adversely and materially affected the limited partnership activities;

(B) the person willfully or persistently committed a material breach of the partnership agreement or of a duty owed to the partnership or the other partners under Section 408; or

(C) the person engaged in conduct relating to the limited partnership's activities which makes it not reasonably practicable to carry on the activities of the limited partnership with the person as a general partner." 805 ILCS 215/603(5) (West 2024).

¶ 128    Plaintiffs state that the same evidence that created a question of fact on their fiduciary duty claim created a question of fact on whether Tom should be expelled as B-Team's general partner. To support their argument, plaintiffs state that Tom engaged in numerous acts that constitute expelling him as general partner, including hiring Martin as B-Team's president to allow him to gain leverage against them in the 2018 chancery case; removing Joe's access to the bank account; agreeing to pay Martin; failing to communicate with the other limited partners; failing to generate revenue; allowing valuable insurance policies to lapse; allowing B-Team to run out of money; and selectively prosecuting Joe and John for not complying with the 2020 capital call.

¶ 129    As previously stated, the record was insufficient to support claims that Tom breached either his fiduciary duties or the LPA. Plaintiffs did not set forth sufficient evidence that Tom engaged in conduct under the Act that would support judicial expulsion of him as general partner.

¶ 130        E. Summary Judgment in Favor of B-Team on B-Team's Counterclaim

¶ 131    Lastly, plaintiffs argue that the circuit court erred in granting B-Team's motion for partial summary judgment on its breach of contract counterclaim and ordering Joe's and John's trusts to pay money into B-Team.

¶ 132    To prove a breach of contract claim, a plaintiff must establish "(1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) resulting injury to the plaintiff." *Wolff v. Bethany North Suburban Group*, 2021 IL App (1st) 191858, ¶ 62.

¶ 133    Plaintiffs assert that the circuit court did not properly analyze the elements of B-Team's breach of contract counterclaim. They argue that B-Team neither established that it performed its obligations under the LPA nor proved that John's and Joe's refusal to contribute funds in response to the April 30, 2020, capital call letter breached the LPA.

¶ 134    B-Team presented sufficient evidence to show it is entitled to summary judgment on its counterclaim against the limited partners for their failure to satisfy their obligations with the April 30, 2020, capital call. As previously discussed, Tom, as general partner, had broad authority to manage B-Team's business affairs, including the authority to hire Martin and issue capital calls, and the evidence was insufficient to show that he breached his fiduciary duties. Further, the record shows that Tom issued a revised capital call letter to the limited partners on April 30, 2020, to cover operation expenses and debt pursuant to section 2.6 of the LPA.

¶ 135    The LPA requires each partner to contribute to B-Team for its operation expenses and debt. Specifically, section 2.2 provides that each partner "agrees to contribute to the capital of the Partnership an amount of cash for operational expenses as hereinafter provided in Section 2.6." Section 2.6 of the LPA provides as follows: "Each Limited Partner shall contribute to the Partnership a *pro rata* portion based on his Percentage Interest [of] the amount of funds required by the Partnership to pay its operation expenses, debt service, or working capital needs in excess of its revenues and other available funds."

¶ 136    The undisputed evidence shows that Joe and John did not contribute funds in response to the April 30, 2020, capital call, and plaintiffs concede that Tom issued a capital call and Joe and John did not provide the requested capital. As such, the undisputed evidence shows that Joe and John breached the LPA because they failed to respond to the capital call that was issued under section 2.6 of the LPA.

¶ 137    We also note that Tom's revised April 30, 2020, capital call specifically addressed a deficiency noted by the accountant and explained that B-Team's accountant had "provided an updated calculation of [B-Team's] ownership percentages and outstanding debt" and, per those recommendations, Tom adjusted the limited partner ownership percentages. However, neither Joe nor John responded to the revised April 30, 2020, capital call.

¶ 138    Plaintiffs assert that B-Team did not prove the accuracy of the capital call because Martin's trusts were included. They argue his trusts should not have been included, as his trusts were deemed withdrawn from the Bredemann Companies after the sale of the Lexus dealership in November 2019.

¶ 139    However, the record shows that the debt represented in the capital call amount was incurred before the sale of the Lexus dealership, as stated in B-Team's accountants' January 29, 2020, letter. Further, plaintiffs assert that the 2018 chancery case is still pending and has not yet resolved whether Martin's trusts should have been included in the April 30, 2020, capital call. As such, there is nothing in the record to show that at the time Tom issued the April 30, 2020, capital call, Martin's trusts were withdrawn from B-Team, such that it was inaccurate to include his trusts in the capital call. Accordingly, we disagree with plaintiffs' argument that B-Team did not prove the accuracy of the capital call because Martin's trusts were incorrectly included.

¶ 140    We note that plaintiffs assert that B-Team did not prove the need for the capital call. However, the evidence showed that when Tom issued the capital call, B-Team did not have any revenue to pay its insurance premiums. Further, B-Team presented evidence that the call was necessary, as it presented the accountant's January 29, 2020, letter to Tom, which provided that, "[t]he capital call is necessary not only for the continued operation of the partnership, but to repay those who have advanced monies for its recent operation."

¶ 141 Plaintiffs also contend that B-Team did not prove damages. They assert that the limited partners have enriched, not damaged, B-Team, as they have covered B-Team's operational expenses, including premium payments, outside of B-Team since 2020. According to plaintiffs, because they engaged in this self-help, B-Team failed to present evidence that it suffered damages due to their refusal to contribute funds in response to the disputed capital call.

¶ 142 However, as previously discussed, plaintiffs failed to respond to the April 30, 2020, capital call that sought funds under section 2.6 of the LPA to cover operational expenses and debt. As a result of the limited partners' failure to respond to the capital call seeking funds for operational expenses and debt, B-Team suffered damages in the amount set forth in the capital call that was not satisfied. The circuit court's order directed all limited partners to pay their respective portion of the capital call that was not satisfied. Accordingly, B-Team presented sufficient evidence to support its claim that the limited partners breached the LPA by failing to respond to the April 30, 2020, capital call letter.

¶ 143                                    III. CONCLUSION

¶ 144 For the foregoing reasons, we affirm the circuit court's order.

¶ 145 Affirmed.

***Bredemann v. Bredemann*, 2026 IL App (1st) 250815**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2020-CH-05196; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| **Attorneys for Appellant:** | David Doyle, of Smith, Gambrell & Russell, LLP, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Douglas M. Chalmers, of Douglas M. Chalmers, P.C., and David F. Hyde, of Law Office of David Hyde, Ltd., both of Chicago, for appellees. |